[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 27, 2008
THOMAS K. KAHN
CLERK

No. 07-13675

D. C. Docket No. 01-02595 CV-TWT

MELBERT RAY FORD,

Petitioner-Appellant,

versus

HILTON HALL,
Warden Georgia Diagnostic and
Classification Prison,

Respondent-Appellee.

Appeal from the United States District Court
for the Northern District of Georgia

**(October 27, 2008)**

Before DUBINA, BLACK and CARNES, Circuit Judges.

DUBINA, Circuit Judge:

Petitioner, Melbert Ray Ford, a death row inmate, appeals from the district court's order denying him habeas relief pursuant to 28 U.S.C. § 2254. For the reasons that follow, we affirm the district court's judgment.

## I. BACKGROUND

A. *Facts*

We recite the facts from the opinion of the Supreme Court of Georgia on direct appeal from Ford's conviction and death sentence.

> After his relationship with Martha Matich broke up, Ford began harassing her by telephone. Two weeks prior to her death, Ford told a friend of his that he "was going to blow her . . . brains out." The day before her death, Ford unsuccessfully tried to convince a friend to drive him to the convenience store where Matich worked. Ford told the friend that he planned to rob the store and work revenge upon Matich by killing her.

> On March 6, 1986, Ford talked to several people about robbing the store. He told one that he intended to kidnap Ms. Matich, take her into the woods, make her beg, and then shoot her in the forehead. Ford tried to talk another into helping him with his robbery (Ford had no car). When this effort failed, Ford responded that "there wasn't anybody crazy around here anymore."

> Finally, Ford met 19-year-old Roger Turner, who was out of a job and nearly out of money. By plying him with alcohol, and promising him that they could easily acquire eight thousand dollars, Ford persuaded Turner to help him.

> They drove in Turner's car to Chapman's Grocery, arriving just after closing time. Ford shot away the lower half of the locked and barred glass door and entered the store. Turner, waiting in the car,

2

heard screams and gunshots. Then Ford ran from the store to the car, carrying a bag of money.

At 10:20 p.m., the store's burglar alarm sounded. A Newton County sheriff's deputy arrived at 10:27 p.m. Ms. Matich was lying dead behind the counter, shot three times. Lisa Chapman was discovered in the bathroom, shot in the head but still alive, sitting on a bucket, bleeding from the head, and having convulsions. She could answer no questions. She died later.

Ford and Turner were arrested the next day. Turner confessed first and was brought into Ford's interrogation room to state to Ford that he had told the truth. Ford told him not to worry, that Turner was not involved in the murders. Afterwards, Ford told his interrogators that the shooting began after Martha Matich pushed the alarm button. He stated that, had he worn a mask, it would not have happened.

Ford claimed at trial that he was too drunk to know what was happening, and that it was Turner who entered the store and killed the victims.

*Ford v. State*, 257 Ga. 461, 461-62, 360 S.E.2d 258, 259 (1987).

B. *Procedural History*

A Newton County, Georgia, grand jury indicted Ford for malice murder and felony murder of Lisa Chapman, malice murder and felony murder of Martha Chapman Matich, armed robbery, possession of a firearm during commission of a felony, and burglary. Following trial in October 1986, the jury found Ford guilty on all counts. At the sentencing phase, the jury found statutory aggravating circumstances as to each murder. The jury found that the malice murder of Lisa

3

Chapman was committed while Ford was engaged in the commission of another capital felony – armed robbery – and during the commission of a burglary. The jury found that the malice murder of Martha Matich was committed while Ford was engaged in the commission of the capital felonies of armed robbery and murder and during the commission of a burglary. The jury recommended that Ford be sentenced to death for the two malice murders. The trial court followed the jury's recommendation and sentenced Ford to death on both malice murder counts, to run consecutively to each other; merged the two felony murder counts into the malice murder counts; and imposed a consecutive 20-year sentence for armed robbery, a consecutive five-year sentence for the firearm possession, and a consecutive 20-year sentence for burglary. The Supreme Court of Georgia affirmed Ford's convictions and sentences on direct appeal. *See Ford v. State*, 257 Ga. 461, 360 S.E.2d 258 (1987). The United States Supreme Court denied *certiorari* review. *Ford v. Georgia*, 485 U.S. 943, 108 S. Ct. 1124 (1988).

In June 1988, Ford filed his first state habeas corpus petition in the Newton County Superior Court. He amended the petition prior to the evidentiary hearing in September 1992. In February 1996, the state superior court directed the parties to present additional evidence to identify any remaining issues and set a deadline for filing post-hearing briefs. The state superior court denied Ford relief in an

4

order filed on December 11, 1996. In 2000, the Supreme Court of Georgia denied Ford's application for probable cause to appeal the state court's denial of habeas relief and denied Ford's motion for reconsideration. The United States Supreme Court denied *certiorari* review on June 4, 2001. *Ford v. Head*, 532 U.S. 1068, 121 S. Ct. 2221 (2001).

Ford filed a second state habeas petition in September 2001. Ford argued that his constitutional rights were violated because the jury returned a verdict that did not contain any finding of aggravating circumstances, and that his constitutional rights were violated because the State suppressed favorable information about Roger Turner's drug use on the night of the offense. In a footnote in his petition, Ford claimed that his trial counsel were ineffective because they failed to obtain and effectively utilize the exculpatory evidence. The state superior court dismissed the petition as successive under O.C.G.A. § 9-14-51 (2006). On March 12, 2002, the Supreme Court of Georgia denied Ford's application for probable cause to appeal.

The day after he filed his second state habeas petition, Ford filed a federal habeas petition and a motion to proceed *in forma pauperis*. The district court granted the motion. In March 2002, Ford amended his federal habeas petition and moved for leave to conduct discovery on a new claim of prosecutorial misconduct.

5

The State responded, and the district court granted Ford leave to conduct discovery on his claim of prosecutorial misconduct. Ford filed a motion requesting an evidentiary hearing and a motion to amend his petition on the ground of prosecutorial misconduct. Ford alleged that the State failed to reveal a deal with Roger Turner wherein the prosecutor promised to write a letter to the state parole board on behalf of Turner. The State opposed the motions. The district court granted Ford's motion and conducted an evidentiary hearing on April 13, 2004. After the parties filed post-hearing briefs, the district court denied Ford relief. *Ford v. Schofield*, 488 F. Supp. 2d 1258, 1282 (N.D. Ga. 2007). The district court also denied Ford's motion to alter or amend the judgment. However, the district court granted Ford a certificate of appealability ("COA") on three issues. This court denied Ford's motion to expand the COA.

## II. ISSUES

1. Whether the district court erred in finding that the State did not violate Ford's constitutional rights by its failure to disclose an alleged deal with Roger Turner, the State's key witness.

2. Whether the district court properly determined that the state court's resolution of Ford's claim of ineffective assistance at sentencing was reasonable.

6

3.  Whether the district court properly determined that the state court's resolution of Ford's Fifth Amendment claim was reasonable.

## III.  STANDARDS OF REVIEW

This court reviews *de novo* mixed questions of law and fact and legal questions, while it reviews the district court's fact findings for clear error.  *See Williams v. Head*, 185 F.3d 1223, 1226-27 (11th Cir. 1999).  This court is precluded from granting habeas relief on any claim that was adjudicated on the merits in state court unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law [or] resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d) (1), (2) (2008). We presume that factual findings by the state court are correct, but the findings can be overcome by clear and convincing evidence.  *See id.*

## IV.  DISCUSSION

A.  *Prosecutorial Misconduct*[1]

---

[1] Ford raised this specific claim for the first time in federal district court.  The district court found that Ford's habeas counsel was diligent in investigating this claim and learned for the first time during discovery in the federal habeas action that the prosecutor at Ford's trial wrote a letter on behalf of Roger Turner to the state parole board.  The prosecutor stated that his letter was not a part of any deal with Turner to testify at Ford's trial, but Turner's attorney stated in an affidavit that he remembered a discussion about a parole letter when making an agreement with the prosecutor

Ford contends that the district court erred in denying him habeas relief based on his claim of prosecutorial misconduct. Specifically, Ford argues that the prosecutor, in his agreement with Turner, promised to write the state parole board on behalf of Turner in exchange for his testimony against Ford at trial, and the State did not disclose the alleged agreement to the defense, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). Ford also claims that the State violated *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972), by not only failing to disclose the parole promise, but also knowingly presenting false testimony denying the existence of the promise. Ford argues that in return for his truthful testimony, Turner testified that he received a 20-year sentence based on his guilty plea to armed robbery, and the State's promise to drop the murder charges, which carried either a life term of imprisonment or the death penalty. Ford contends that the implication from Turner's testimony is that the 20-year sentence was all that he received for his testimony, but Ford contends that in reality, Turner received more – he received a promise of parole assistance. Thus,

about Turner's testimony. Based on this information, the district court determined that Ford met the burden enunciated in 28 U.S.C. § 2254(e)(2)(A)(ii) to be entitled to an evidentiary hearing on this claim. *See* 28 U.S.C. § 2254(e)(2)(A)(ii) (stating that a district court can hold an evidentiary hearing on a new claim if the petitioner was unable to discover the factual predicate of the claim through the exercise of due diligence). We will not review the district court's decision that Ford was entitled to an evidentiary hearing in light of our disposition of this claim. In reviewing this claim, we will consider not only the evidence presented at the evidentiary hearing, but also, the evidence already in the record.

8

Ford claims that the State presented false testimony, through Turner's omission regarding parole help, and this violated *Giglio*.

Following an evidentiary hearing on this claim, the district court found that there was no pre-trial deal or agreement between the prosecutor and Turner that the prosecutor would write a letter to the state parole board on Turner's behalf in exchange for his testimony. The district court further found that even if a promise to write a letter to the parole board was part of Turner's "agreement," the prosecution was not required to disclose the promise under *Giglio* because the letter was of such marginal benefit that its disclosure was not warranted. Accordingly, the district court denied Ford relief on this claim.

In *Brady v. Maryland*, *supra*, the Supreme Court held that the suppression of material, exculpatory evidence by a prosecutor violates due process. The nondisclosed evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068 (1984)).

"*Giglio* error, a species of *Brady* error, occurs when 'the undisclosed evidence demonstrates that the prosecution's case included perjured testimony and that the prosecution knew, or should have known, of the perjury.'" *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (quoting *Ventura v. Att'y Gen., Fla.*, 419 F.3d 1269, 1276-77 (11th Cir. 2005), *cert. denied*, 127 S. Ct. 3010 (2007). To prevail on a *Giglio* claim, a petitioner must establish that "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material- i.e., that there is 'any reasonable likelihood' that the false testimony 'could . . . have affected the judgment.'" *Id.* at 1253 (quoting *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766). This standard of materiality is equivalent to the *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967), "harmless beyond a reasonable doubt" standard. *Bagley*, 473 U.S. at 679 n.9, 105 S. Ct. at 3382 n.9. The disclosure requirement ensures that "'the jury knows the facts that might motivate a witness in giving testimony.'" *Brown v. Wainwright*, 785 F.2d 1457, 1465 (11th Cir. 1986) (quoting *Smith v. Kemp*, 715 F.2d 1459, 1467 (11th Cir. 1983)). Accordingly, the prosecution has a duty to disclose evidence of promises made to a witness in exchange for testimony. *Giglio*, 405 U.S. at 154-55, 92 S. Ct. at 766; *Tarver v. Hopper*, 169 F.3d 710, 716 (11th Cir. 1999).

10

At the federal evidentiary hearing, prosecutor John Ott testified that he entered into an agreement with Ford's co-defendant Turner wherein if Turner testified truthfully and in accordance with his statements to the police, the State would recommend that the trial court sentence Turner to 20 years' imprisonment based on his guilty plea to armed robbery, and that the State would drop the murder charges, which carried either a life term of imprisonment or the death penalty. Ott stated emphatically that the plea agreement did not include his promise to write a letter to the parole board on Turner's behalf, saying that he "know[s] with certainty that that was not part of the deal and that [he] would not have committed [him]self to writing a letter prior to the trial." (District Ct. R. vol. 10, 48.) Ott stated that he would want to wait until after the witness testified before he agreed to write such a letter. Ott testified that he "would never want to put [him]self in a position of a defendant who got up on that stand and did not make a strong witness, did not testify well, and then after the trial came to [him] and said, well, now you got to write me a letter to the Parole Board." (*Id.* 36-37.) According to Ott, the decision to write a letter to the parole board occurred after Turner testified in an impressive manner at Ford's trial. (*Id.* 39-40.) Ott's testimony is substantiated by the letter he wrote to the parole board in which he stated that after Turner testified, Ott told Turner that he (Ott) would do whatever

11

he could to see that Turner was paroled when the time came.[2]  Additionally,

Turner's testimony corroborated Ott's recollection of the plea agreement.  Turner

stated that although he and his counsel discussed trying to get Ott to help with the

parole board, his plea agreement with the State did not include such a promise.

(*Id.* 55, 58.)

The district court did not err in denying Ford relief on this claim.  After

hearing all the evidence presented at the evidentiary hearing, the district court

found that there was no promise of parole help until after Turner had testified.

This finding is not clearly erroneous.  As a result, there was no promise of parole

help for the prosecutor to disclose at the time Turner testified, and even if Turner's

testimony did implicitly deny such a promise, that denial was not false.  Because

there was no promise by the prosecutor of parole help to Turner before he

testified, there is no violation under either *Brady or Giglio*.

---

[2] Ott's letter stated in part:

> At the time of trial, I was impressed with Mr. [Turner's] acceptance of his illegal acts and strong desire to do whatever he could to rectify his wrongs, accept his punishment and then continue with his life. . . . I told Mr. Turner, after he had testified, that I would do whatever I could to see that he was paroled when the time came.

(District Ct. R., Pet'rs Ex. 5.)

12

Furthermore, even if there was a pre-trial agreement between prosecutor Ott and Turner, it is not material under either *Brady* or the more defense friendly *Giglio* standard. The State had two murder charges pending against Turner at the time of Ford's trial. The State's offer to give Turner a 20-year sentence for his guilty plea to armed robbery instead of pursuing the murder charges that carried either a term of life imprisonment or the death penalty gave Turner a huge incentive to testify the way the State wanted him to testify. In other words, if Turner were going to testify falsely to get a deal, the State's promise of a 20-year sentence instead of the alternatives was all the incentive he needed. Thus, there is no reasonable probability that if the jury had known of the alleged parole promise that the result of the trial could have been different. Nor is there a reasonable likelihood that any false implications from Turner's testimony would have affected the verdict of the jury. Accordingly, the district court properly denied Ford relief on this claim.

B. *Sentencing Counsel*

Ford argues that the district court erred in finding that the state court's resolution of his claim of ineffective assistance of sentencing counsel was reasonable. Ford contends that his sentencing counsel failed to investigate properly for mitigating evidence as mandated under *Wiggins v. Smith*, 539 U.S.

510, 123 S. Ct. 2527 (2003), and *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495 (2000).

The Supreme Court's well-established standard enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984), governs claims of ineffective assistance of counsel. In *Strickland*, the Court held that in order to prevail on a claim of ineffective assistance of counsel, a petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the petitioner's defense or sentencing. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. The standard governing counsel's performance is "reasonableness under prevailing professional norms." *Id.* at 688, 104 S. Ct. at 2065. "We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately." *White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir. 1992). The petitioner's burden to prove by a preponderance of the evidence that counsel's performance was unreasonable is a heavy one. *See Chandler v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). The petitioner must show that "no competent counsel would have taken the action that his counsel did take." *Id.* at 1315.

In judging the adequacy of counsel's investigation of potential mitigating circumstances, we consider "'counsel's perspective at the time' investigative

14

decisions are made" and give "'a heavy measure of deference to counsel's judgments.'" *Rompilla v. Beard*, 545 U.S. 374, 381, 125 S. Ct. 2456, 2462 (2005) (quoting *Strickland*, 466 U.S. at 689, 691, 104 S. Ct. at 2052). Counsel is not required to investigate and present all available mitigating evidence in order for counsel's investigation to be reasonable. *Burger v. Kemp*, 483 U.S. 776, 794-95, 107 S. Ct. 3114, 3126 (1987). The court should "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [petitioner's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 523, 123 S. Ct. at 2536. Furthermore, in evaluating the reasonableness of the investigation, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527, 123 S. Ct. at 2538.

Pursuant to the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d), which governs this habeas action, an application for habeas relief can only be granted if the adjudication of the claim in state court resulted in a decision that was contrary to, or involved an unreasonable determination of, clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Williams*, 529 U.S. at 376, 120 S. Ct. at

15

1504 (O'Connor, J.). A state court decision is "contrary to" Supreme Court precedent if a state court applies a test that contradicts the governing one, or a state court reaches a different result on a substantially similar set of facts. *Id.* at 405-06, 120 S. Ct. at 1519-20. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S. Ct. at 1523. Because Ford only challenges the "unreasonable application" clause, we must determine whether the state court's resolution of this claim involved an unreasonable application of the *Strickland* standard.[3]

Specifically, Ford contends that his trial counsel, John Howell and Ben Hendricks,[4] were deficient for failing to interview more family members, school teachers, and a minister and for failing to present mitigation evidence, such as

---

[3] Ford contends that *Wiggins* and *Rompilla* set forth a new standard for effective assistance of counsel. We rejected a similar argument in *Williams v. Allen*, 458 F.3d 1233 (11th Cir. 2006). *Williams*, 458 F.3d at 1244 ("Although Williams urges us to apply *Wiggins* to his case, the controlling Supreme Court precedent with regard to claims of ineffective assistance of counsel is *Strickland*."), *cert. denied*, 127 S. Ct. 1874 (2007); *see also In re Hutcherson*, 468 F.3d 747, 749 (11th Cir. 2006) ("The Court's decision in *Rompilla* was another interpretation of the Court's long-standing principles set forth in *Strickland*.").

[4] At the time of Ford's trial, Howell had been practicing law for fourteen years and had participated in over two hundred felony trials, including two capital cases. The trial court appointed Hendricks to assist Howell. Hendricks had been a member of the state bar for approximately ten years and had been involved in several serious criminal cases prior to representing Ford. (State Trial R. 1074-75; State Habeas Proceedings, Ex. 3, Doc. 17, 85, 295.)

16

medical, psychiatric, and school records. According to Ford, had trial counsel conducted an adequate investigation, they would have discovered the following important mitigation evidence: that Ford had a history of problems with alcohol and legal and illegal drugs; that Ford had periods of blinding headaches and blackouts; that Ford had a history of severe asthma, allergic reactions, and other physical problems; that Ford took medication that had the potential to cause numerous deleterious side effects; that Ford had a history of severe emotional problems; that Ford had received psychological treatment; that Ford's father had been addicted to alcohol and pain killers; that Ford's family was financially unstable; that Ford performed poorly in school; that in the weeks preceding the murders, Ford had been abusing drugs and alcohol; and that Ford had a caring personality.

In rejecting this claim following an evidentiary hearing, the state habeas court held:

> Mitigation evidence from an independent psychiatrist and from the Petitioner's mother was presented. Petitioner cannot demonstrate any constitutional violation in his own failure to present other evidence. The Court finds that Petitioner agreed with counsel's decision not to present certain other witnesses that counsel and Petitioner had discussed. Petitioner cannot now be heard to complain about a strategic decision he and his attorney made.

17

Further, some, if not all, of the evidence Petitioner alleges should have been presented (other family members, a former school teacher, and a minister) would have been cumulative of some of the testimony and emotional pleas offered by the two mitigation witnesses. The habeas court cannot second guess the decision of a defendant and his counsel regarding when enough mitigation evidence has been presented. The fact is, the opportunity to present such evidence was given and there can be no constitutional violation when a defendant and his counsel decide that they have exercised that right to the fullest extent desirable. Demonstrating in the habeas proceeding that there were other witnesses who could have testified at trial does not, by itself, prove that counsel was ineffective for not presenting them at trial.

(State Habeas Proceedings, Ex. 2, Doc. 16, 65-66 (record and case citations omitted)).

The district court concluded that the state habeas court's decision warranted deference and found that counsels' performance at sentencing was effective. The district court reasoned as follows:

The record from the state habeas proceeding suggests the possibility that trial counsel did not perform a thorough investigation of the Petitioner's background. However, trial counsels' failure to interview a number of these witnesses or to investigate certain aspects of the Petitioner's background may have been due to what, if any, information the Petitioner supplied to trial counsel. The Supreme Court has stated that the reasonableness of counsel's actions should be evaluated based on "strategic choices made by the defendant and on information supplied by the defendant." With regard to potential mitigation witnesses, Mr. Howell testified at the state habeas hearing that he could not recall whether the Petitioner ever provided him with the names of any additional witnesses that might be helpful during the sentencing phase. According to Howell, if the Petitioner had asked

18

him to contact or to call any witnesses to testify in mitigation, they would have been subpoenaed for trial. Similarly, Howell testified that the Petitioner did not alert him to any history of physical problems or substantial drug or alcohol abuse that should be investigated further. In addition, the Petitioner also asserts that trial counsel failed to present evidence that he had asked for mental health assistance in Rockdale County several weeks before the murders. However, there is nothing in the record to indicate that trial counsel were given this information. As such, trial counsel should not be faulted for failing to uncover the evidence on their own. Under such circumstances, trial counsels' investigation would not be deemed constitutionally deficient.

Having found that trial counsel made a strategic decision along with the Petitioner regarding what mitigating evidence to present, the state habeas court did not expressly address the prejudice prong of the *Strickland* test. However, this Court finds that even if trial counsels' performance was deficient, the Petitioner has not shown prejudice stemming from the alleged failures. Although the Petitioner challenges trial counsels' failure to call a number of witnesses in mitigation, the Supreme Court has made clear that trial counsel is not required to present all available mitigating evidence during the sentencing phase. Similarly, the Eleventh Circuit has stated that "[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel. Furthermore, as the state habeas court found, the majority of the affidavit testimony presented during the state habeas proceeding was not substantively different than the evidence actually presented to the jury. For example, the Petitioner testified during the guilt-innocence phase about his drug and alcohol use. At the sentencing phase, Dr. Newkirk testified extensively about the Petitioner's emotional and psychological problems. Dr. Newkirk testified that as a child, the Petitioner had behavioral problems and had received psychological treatment beginning in elementary school, including a two week in-patient psychiatric stay after dropping out of high school. She also testified that the Petitioner had residual attentive deficient disorder

and antisocial personality disorder, the hallmark of that disorder being the emotional inability to control one's impulses. According to Dr. Newkirk, in the months leading up to the murders, the Petitioner had become extremely depressed and was using drugs and alcohol, which intensified the depression and exacerbated the impulse control problems. The second defense witness, Georgia Ford, agreed with Dr. Newkirk's assessment of the Petitioner's emotional problems, childhood and beyond. She testified that the family tried, unsuccessfully, to get the Petitioner help for his emotional problems by taking him to school counselors and mental health professionals. Although other witnesses could have testified to the Petitioner's psychological problems or to his behavior leading up to the murders, trial counsel were not required to call additional witnesses to present redundant or cumulative evidence.

It appears that the only issues addressed in the affidavit testimony that were not presented during the sentencing phase concerned: (1) the Petitioner's history of headaches, allergies, and asthma; and (2) the Petitioner's father's addiction to pain killers and alcohol. The Petitioner also asserts that the witnesses could have testified to his caring personality. In order to establish prejudice, the Petitioner must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Here, the jury found three statutory aggravating circumstances with regard to the malice murder of Martha Matich, i.e., that the murder was committed during the commission of two capital felonies (armed robbery and murder) and during the commission of a burglary, and two statutory aggravating circumstances associated with the malice murder of Lisa Chapman, i.e., that the murder was committed during the commission of a capital felony (armed robbery) and during the commission of a burglary. In light of the weight of this and other aggravating evidence, including the fact that the Petitioner shot a child in the head at close range, the new evidence cited by the Petitioner is not compelling mitigation evidence, even when combined with the evidence presented at sentencing, such that there is a reasonable

probability that had the jury heard this testimony the sentencing outcome would have been different. The Petitioner's claim of ineffectiveness based on a failure to investigate and present mitigating evidence is without merit.

(District Court R. vol. 5, Doc. 69, 150-56 (internal citations omitted).

We agree that Ford is not entitled to relief on his claim of ineffective assistance of sentencing counsel. As the record demonstrates, much of what counsel presented at the guilt-innocence phase was relevant to and carried over to the sentencing phase. Howell testified at the state habeas hearing that he visited the crime scene, reviewed Turner's video-taped statement, and conferred with Ford a number of times. According to Howell, Ford's recollections of events were somewhat clouded due to Ford's alcohol and marijuana use, and Ford indicated that he was so intoxicated on the night of the crime that he could not have gotten out of the car. Counsel filed approximately twenty-three pretrial motions, including a motion for an independent mental health expert, which the trial court granted. Counsel reviewed both the prosecutor's and the Georgia Bureau of Investigation's ("GBI") files. Howell stated that he or his co-counsel interviewed every witness of whom they were aware. He stated that he obtained most of Ford's background from Ford himself. Howell testified that their defense theory for the guilt-innocence phase was to show that Roger Turner committed the

21

murders, that Ford was in no condition to commit the crimes, and that Ford had no real motive to commit the murders because he still loved his ex-girlfriend, one of the victims. (State Habeas Proceedings, Ex. 3, Doc. 17, 85-295.)

Ford agreed on the record with his counsels' decisions not to call some witnesses at trial. (State Trial R. 662.) Ford's aunt, sister-in-law, mother, and Ford himself testified at trial. Counsel stated that he decided to make his final decision about sentencing phase witnesses after what happened at the guilt-innocence phase. (State Habeas Proceedings, Ex. 3, Doc. 17, 259 (indicating Howell's statement that a lot of what he might have done at sentencing was dictated by the State's strategy)). Counsel secured the services of a psychiatrist, Dr. Cassandra Newkirk. Counsel asked Dr. Newkirk to prepare as much information as possible concerning Ford's family background, history, childhood, and development for use not only at trial, but also at the sentencing phase. Counsel also sought to question Dr. Newkirk about any drug or alcohol abuse by Ford or obsessive relationships in which Ford was involved.

At the penalty phase, Dr. Newkirk testified extensively about Ford's emotional and psychological problems. Dr. Newkirk noted that Ford's parents had sought mental health assistance for Ford in high school. She stated that Ford was evaluated at Central State Hospital where he was diagnosed with residual attention

22

deficit disorder and antisocial personality disorder. Dr. Newkirk opined that Ford had impulse control disorder that was "like water in a pot that's boiling and the lid is on and they get so angry at times that the lid blows." (State Trial R. 1000.) Dr. Newkirk also proffered that Ford was depressed before the crime and probably did not have control at the point when the murders occurred.

The record supports the state court's finding that Ford's trial counsel were not deficient. Howell testified extensively that he had regular contact with Ford and his family, and that he got most of the background information on Ford from them. He stated that Ford did not alert him to any background of alcohol or drug abuse, and Ford gave him no reason to question his (Ford's) competency. Howell allowed Ford a great deal of opportunity to have input in the defense decisions. Howell commented that he "felt like it was [Ford's] right to not only be consulted but if it was a tactical decision or a determination of what witnesses to call or anything like that that he ought to have some – not just some input, but the final word on that sort of thing." (State Habeas Proceeding, Ex. 3, Doc. 17, 195.) *Cf. Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by

23

the defendant. In particular, what investigation decisions are reasonable depends critically on such information."); *see also Newland v. Hall*, 527 F.3d 1162, 1202 (11th Cir. 2008) ("In evaluating the reasonableness of a defense attorney's investigation, we weigh heavily the information provided by the defendant."). Howell motioned for the assistance of a psychiatrist, which the court granted. Howell testified that he relied on Dr. Newkirk's thorough psychological evaluation to provide him with necessary trial and sentencing information. Moreover, Ford acknowledged on the sentencing record that he agreed with counsels' decision regarding what mitigation evidence to present. (State Trial R. 983.) Based on this testimony and our review of the record, we conclude that Ford's counsel were not deficient in their investigation of Ford's background.

However, even assuming that Ford's counsel were deficient, Ford cannot satisfy the prejudice prong of *Strickland*. The majority of the affidavit testimony presented at the state habeas hearing was not substantively different from the evidence presented to the jury at sentencing. Ford himself testified at the guilt/innocence phase about his drug and alcohol use. Moreover, Dr. Marc Zimmermann's clinical psychological report diagnosed Ford with Dysthymia, or major depression, and borderline personality disorder. Nothing in this report contradicted Dr. Newkirk's assessment and testimony.

24

Counsel is not required to call additional witnesses to present redundant or cumulative evidence. *See Jennings v. McDonough*, 490 F.3d 1230, 1244 (11th Cir. 2007), *cert. denied*, 128 S. Ct. 1762 (2008); *Marquard v. Sec'y for Dep't of Corr.*, 429 F.3d 1278, 1307 (11th Cir. 2005). With respect to the evidence that the jury did not hear – Ford's history of headaches, allergies and asthma, his father's addiction to pain killers and alcohol, and that Ford was a caring person – there is no reasonable probability of a different result, meaning one sufficient to undermine our confidence in the outcome. In light of the jury's finding of three statutory aggravating circumstances, and the fact that Ford shot a child in the head at close range, this omitted mitigation evidence is not compelling. Accordingly, Ford is not entitled to relief on his claim of ineffective assistance of sentencing counsel.

C. *Fifth Amendment Right*

Ford claims that his Fifth Amendment right to counsel was violated during his police interrogation. Both the state courts and the federal district court denied Ford relief on this claim. We agree with their findings.

On direct review, the Supreme Court of Georgia found:

Ford was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as soon as he was taken

25

into custody. He was transported to Newton County, re-advised of his *Miranda* rights, and then interrogated.

After it was relayed to Ford that co-defendant Turner had admitted his involvement in the robbery and the murders, and one of the interrogators told Ford that he believed Ford to have been responsible for the victims' deaths, Ford asked if he could "call his attorney." GBI agent Nicholson advised Ford that he could. Then Ford began questioning agent Nicholson about Turner's statement. Nicholson stopped Ford and told him that because he had asked for an attorney, they "could not continue the interview until he talked to one, unless he changed his mind and wanted to continue without it." Ford responded that he would like to continue the interview without his attorney.

Later on, Nicholson offered the defendant a chance to record his statement on videotape. Ford stated that he would like to confer with an attorney before making any recorded statements. Nicholson asked him "if he wanted to talk to an attorney before continuing on and he said he wished to continue the interview, but he didn't want to make any recorded statements until he talked with an attorney."

If an accused asserts his right to counsel during custodial interrogation, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct.1880, 68 L.Ed.2d 378 (1981).

Ford argues that his requests for counsel were not honored and that his rights under *Edwards v. Arizona,* supra, were violated. We do not agree.

Not only was his question about calling an attorney not a clear invocation of his right to counsel, compare *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the defendant "himself" initiated further conversation with the police. At this point, his

26

interrogator was justified in stopping him and determining whether he wanted to call his attorney or to continue the interview.

Ford's later invocation of his right to counsel with regard to a video taped statement was an invocation of a limited right *only*, which the police were required to honor to no greater extent than the express limits of his reservation.

The trial court did not err by finding that Ford's statements were voluntary and that the defendant's rights as set forth in *Miranda v. Arizona, supra,* and *Edwards v. Arizona,* supra, were not violated.

*Ford v. State*, 257 Ga. 461, 465-66, 360 S.E.2d 258, 262 (citations omitted).

As the district court correctly found, the Supreme Court of Georgia's decision on this issue was not an objectively unreasonable application of the clearly established Supreme Court precedent that existed at the time. The record supports the state court's finding that Ford's request for counsel was ambiguous. The state court's findings are entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See Isaacs v. Head*, 300 F.3d 1232, 1251, 1253 (11th Cir. 2002). Ford cannot rebut this presumption of correctness. Further, even if Ford's request was not equivocal, Ford himself initiated further conversation with the police. Any police questioning of Ford after he asked whether he could call an attorney was limited to clarifying whether Ford wanted to call an attorney or wanted to continue the interview. Following the attempts to clarify Ford's statement, Ford resumed discussions relating to the crimes by questioning GBI

27

Agent Nicholson about Turner's statement to the police. Moreover, Ford's waiver of his right to counsel was voluntary. There is nothing in the record to indicate that the police coerced or pressured Ford into making his statements. Therefore, we conclude that the Supreme Court of Georgia did not unreasonably apply clearly established federal law by holding that Ford waived the right to counsel by voluntarily initiating further discussions with the police. Accordingly, he is not entitled to relief on this claim.

## V. CONCLUSION

The district court correctly determined that Ford was not entitled to habeas relief on his claims of prosecutorial misconduct, ineffective assistance of sentencing counsel, and a Fifth Amendment violation. Accordingly, we affirm the district court's judgment denying Ford habeas relief.

**AFFIRMED**.