[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14378
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cv-22353-MGC

MICHAEL LOCASCIO,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(April 18, 2017)

Before HULL, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Michael Locascio, a pro se Florida prisoner, appeals the denial of his 28 U.S.C. § 2254 habeas corpus petition, challenging his convictions for first-degree murder, burglary with assault, armed robbery with a deadly weapon, and conspiring to commit first-degree murder. A certificate of appealability ("COA") was granted on these two issues: (1) whether the prosecutor knowingly failed to correct Jeffery Johnson's false testimony that he had followed laboratory protocol—that requires another DNA analyst to co-read DNA test results—before he disseminated DNA test results, in violation of Locascio's due process rights and Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763 (1972); and (2) whether Locascio received ineffective assistance of counsel when trial counsel failed to impeach Johnson as to this testimony. After careful review, we affirm the district court's denial of relief on these two claims.

## I.  BACKGROUND

### A.    Divorce Proceedings

Petitioner Michael Locascio killed his sister-in-law, Sylvia Locascio, known as Maggie, who was in the midst of a bitter divorce with his brother, Edward Locascio, Sr.  Maggi and Edward Locascio lived in Miami, Florida, and Petitioner Locascio lived in Charlotte, North Carolina.  At trial, the State proved that petitioner Locascio conspired with his brother Edward to kill Maggie the night

before her deposition in the Florida divorce proceedings and to make it look like a home-invasion robbery.

In June 2001, Maggie Locascio filed for divorce and obtained a domestic violence restraining order against her husband.  The restraining order required Ed Locascio to move out of the marital residence and have no contact with Maggie Locascio.  Maggie remained in the marital home with the couple's 19-year-old son, Eddie Locascio.  According to Eddie Locascio, around the time his parents separated, his father told his mother, "I will kill you.  I will end you.  And I will destroy you."  After this threat, Maggie Locascio changed the code for the home alarm and both she and Eddie made it a habit to immediately re-alarm the house after they had entered it.

By August 2001, Maggie Locascio's divorce lawyer had uncovered marital assets in excess of $3 million that Ed Locascio had hidden in shell corporations and obtained a restraining order preventing Ed Locascio from touching these assets.  By October, the lawyer had also learned that Ed Locascio had a mistress and was exploring how much money he had spent on this relationship.  In mid-October 2001, Ed Locascio was held in contempt for failing to comply with the divorce court's orders, including subpoenas to produce financial documents.

Meanwhile, petitioner Michael Locascio was living in North Carolina with his wife and young son, but had not worked in over two years due to an injury.  In

3

the summer of 2001, as a result of their financial troubles, petitioner Locascio's wife told him she wanted a divorce.

## B.    Murder and Criminal Investigation

On October 30, 2001, police officers responding to a residential alarm call found Maggie Locascio's body inside her Miami home, where she was bludgeoned, beaten, stabbed and strangled.  Lying next to the victim's body was her purse and a heavy, metal baton, also called "an asp."  Large amounts of blood were on the floor and the wall of the room.

Because DNA evidence ultimately tied petitioner Michael Locascio to the murder, here is why there was so much blood evidence.  According to the medical examiner, Maggie Locascio's injuries included stab wounds to her face, neck, and front torso, lacerations to her head caused by a blunt object, a broken rib, and a collapsed lung.  The victim had defensive wounds on her forearms and hands and cuts on her fingers consistent with the victim having grabbed the serrated edge of the knife.  The victim's face was bruised and cut as if she had been punched, and the side of her face had a bruise pattern consistent with the sole of a shoe.  There was also a footprint mark on the victim's chest.   The victim had wounds to the back of her head where it hit the floor, which caused her brain to hemorrhage and swell.  The victim also had ligature marks on her neck and other signs of strangulation.

The pattern of blood on the floor and walls and the presence of blood on the bottoms of the victim's feet indicated that she had moved around while she bled and also that she stood in her own blood. The medical examiner opined that Maggie Locascio's injuries did not cause immediate unconsciousness or death and that she engaged in a prolonged struggle with her attacker that lasted several minutes. Maggie Locascio ultimately died of a combination of loss of blood, swelling of the brain, and lack of oxygen.

Around the time of the murder, two eyewitnesses, one a police officer and the other a neighbor, noticed a suspicious, white pick-up truck with a camper top near the victim's home. Two days after the murder, another neighbor found a gray/beige long-sleeved shirt ("the beige shirt") draped over a gym bag in some bushes in her yard in Miami. Inside the gym bag was a blood-stained knife, surgical rubber gloves, a cloth baton holder, two sports drink bottles, credit cards and identification belonging to Maggie Locascio, and a blue plaid short-sleeved shirt ("the blue shirt"). Subsequent DNA testing revealed that DNA matching petitioner Locascio was found on the beige shirt, the rubber gloves, and the baton lying next to Maggie Locascio's body.

Initially, Edward Locascio, Sr., the victim's estranged husband, was the state investigators' main suspect, but surveillance camera footage and cell phone records established that he could not have committed the crimes himself. A few days after

5

the murder, an employee of Edward Locascio, Sr. advised investigators that Edward's brother, petitioner Locascio, owned a white pick-up truck with a camper top. Although the Locascio brothers generally spoke only two or three times each year, phone records showed 24 calls between the brothers in the month before the murder.

At petitioner Locascio's home in North Carolina, investigators impounded his truck on November 4, 2011, and interviewed him and obtained a DNA sample on November 6, 2001. Petitioner Locascio admitted being in Miami to visit his brother during the time of the murder, but claimed that he was unable to see his brother and returned to North Carolina. Video surveillance showed petitioner Locascio ringing the doorbell at his brother's apartment a couple of hours after the murder, and a dark spot was visible on his lower back and buttocks.

At the time of his arrest, investigators found what appeared to be contact dermatitis on petitioner Locascio's buttocks and upper leg, which was consistent with him sitting on a wet surface for an extended period of time. The search of petitioner Locascio's truck revealed that the seat covers had been removed, exposing the foam, and the seats were damp. Carpeting from the bottom panel also had been removed, and the floorboards seemed wet. Condensation and water were found inside the truck.

While in pretrial detention, petitioner Locascio admitted to a cellmate that he had killed his sister-in-law because she was trying to take his brother's money, and Locascio stated that the victim got what she deserved.  Petitioner Locascio also offered money to two cellmates to plant DNA evidence, going so far as to provide his DNA to a cellmate on a white t-shirt and inside a jail-issued pen.  The cellmate instead turned the white t-shirt and the pen over to investigators.

## C.    State Trial and Conviction

Petitioner Locascio's trial began on February 21, 2006.  During the trial, the State put in evidence that petitioner Locascio's DNA was on the beige shirt, the rubber gloves, and the metal baton.  This DNA evidence was disclosed well in advance of trial.  But before that DNA evidence came in, the State indicated that it would also seek to introduce newly obtained DNA evidence.

On the third day of trial, the parties raised with the trial court the State's plan to introduce newly obtained DNA test results showing that petitioner Locascio's DNA was also on the blue shirt that was found inside the gym bag.  During a side-bar, defense counsel objected to the late discovery of this evidence.

The prosecutor explained that she delayed DNA testing on the blue shirt because she believed the shirt belonged to either Edward Locascio, Sr. or his son Eddie, rather than the petitioner.  When Eddie advised the prosecutor a few months before trial that he was unsure whether the shirt was his, the prosecutor sent the

blue shirt for DNA testing.  The initial results indicated that the DNA on the blue shirt could have belonged to any of the three Locascio men.  The prosecutor instructed the crime lab to test a different portion of the blue shirt.

The prosecutor stated that the day before the trial began, February 20, 2006, which was President's Day, she received a call from the crime lab reporting that DNA on the blue plaid shirt belonged to petitioner Locascio.  The prosecutor then called defense counsel and relayed this information to him.  The prosecutor explained to defense counsel that the results were preliminary and that she could not get him a report until the results were co-read, i.e. reviewed and verified, by another DNA analyst, Dr. Michael Hass, who was on vacation, as follows:

> So I called [defense counsel] and I said, "Listen, it's not Eddie's shirt "- - as you will see when he testifies, he's in medical school - -" but it's your client's, but I cannot get you a report on this shirt because it hasn't be coread because Michael [Hass] is on vacation."
> So I said, "That would be preliminary, but I am not really allowed to tell you this because the DNA examiner said it's not proper," but I went the extra step and violated his confidence.

The state trial judge stated that the prosecutor was "wise" to have done so, and the prosecutor advised the judge that she would receive the final report on Monday (February 27, 2006), when Dr. Hass returned.

The state trial court concluded that it was necessary to hold a Richardson hearing to inquire into the circumstances of the prosecutor's late disclosure of the

new DNA test results.[1]  During the Richardson hearing, the prosecutor again explained that it took four years to conduct DNA tests on the blue shirt because she had labored under the mistaken belief that the blue shirt belonged to either Edward Locascio, Sr. or his son, Eddie.  The prosecutor did not obtain a DNA sample from Edward Locascio, Sr. until late October 2005, lab testing did not begin until January 2006, and the initial tests could not exclude any male Locascio.

On Friday, February 17, 2006, the prosecutor asked the lab analyst to test a different part of the blue shirt. The lab analyst performed the test over the weekend and called the prosecutor on Monday, February 20, 2006.  The prosecutor explained that she called defense counsel as soon as she received the results.

The state trial court concluded that the State's failure to provide the DNA evidence was inadvertent, but substantial.  Turning to prejudice, the state court noted that the state would be introducing evidence that the gloves, the beige shirt, and the metal baton all had petitioner Locascio's DNA on them.  Defense counsel argued that the protocol followed by the DNA analyst in testing those three pieces of evidence was flawed.  The prosecutor pointed out that the same DNA analyst, Jeff Johnson, and the same co-reader, Dr. Hass, were involved in testing the blue shirt.  The state court concluded that there was no prejudice to petitioner Locascio

---

[1]See Richardson v. State, 246 So.2d 771, 775 (Fla. 1971) (providing that the trial court's inquiry into discovery violations includes whether the state's conduct was inadvertent or willful, whether the violation was trivial or substantial, and whether the violation prejudiced the defendant's ability to prepare for trial).

because his attack applied to all the DNA evidence Jeff Johnson had tested, as follows:

> I am going to find . . . no prejudice because I still think whatever theory you have attacking the State on the DNA remains the same. It's the same lab. It's the same people involved. There's three other items.
> I will put this on the record for any appellate court, if they ever see it, if there had never been any DNA found and this came up, then we are talking about something that I think the prejudice at that point would be overwhelming.
> You will be getting a copy of the report.

On Monday, February 27, 2006, Dr. Hass completed co-reading Johnson's DNA test results of the blue shirt, and the report was provided to defense counsel.

On March 9 and 10, 2006, the State's DNA analyst Johnson testified. Among other things, Johnson stated that: (1) during testing, DNA samples from the handle of the metal baton and some of the rubber gloves were consistent with a mixture of the victim's DNA and petitioner Locascio's DNA, blood on the knife and the beige shirt matched the victim's DNA, and a DNA sample from the collar of the beige shirt matched petitioner Locascio's DNA; (2) in his crime lab, reports of lab results were given to another lab analyst to co-read the results to ensure they were correct; (3) Johnson was not permitted to give lab results to anyone until they were co-read because they were not official; and (4) Dr. Hass, the crime lab's technical director, co-read his results and agreed with his findings.

Johnson further testified that he was asked later to test the blue shirt. Johnson's first cutting from the collar of the blue shirt did not contain enough information for a full comparison, but a second cutting from the collar contained a full DNA profile. The DNA on the second cutting matched petitioner Locascio's DNA and did not match the DNA of Edward Locascio, Sr. or his son Eddie.

After reviewing the DNA evidence, the prosecutor confirmed with Johnson that the lab results were co-read by Dr. Hass before being provided to anyone, as follows:

> Q. All of these items, not just the white shirt, all of these items [were] coread by Dr. Haas?
> A. That is correct.
> Q. Prior to any results being provided?
> A. That is correct.

(Emphasis added).

During cross-examination, defense counsel asked Johnson about his last-minute testing of the blue shirt, but did not ask Johnson about the premature release of the DNA test results to the prosecutor before those results were co-read by Dr. Hass. Instead, defense counsel's cross-examination attempted to show Johnson's DNA testing was unreliable by emphasizing Johnson's lack of qualifications and his crime lab's failure to use corroborative testing to confirm results or to use other more-advanced methods of DNA analysis employed by other crime labs.

In addition, defense counsel questioned Johnson about his violation of an anti-contamination protocol in 37 different criminal cases. In these 37 cases, Dr. Hass, as the co-reader, discovered that Johnson's control did not include a reagent, an ingredient that ensures no contamination of the test. Johnson determined that his error was due to his needing a new eyeglasses prescription, and he had to rerun those tests. One of those 37 cases involved Johnson's testing of the white t-shirt that petitioner Locascio's cellmate gave to investigators.

During closing arguments, the State argued, inter alia, that Johnson's DNA testing was reliable, in relevant part, because it was checked by Dr. Hass before it was disseminated, as follows:

> [Johnson] also told you something even very [sic] important than what we give credit for doctors. He told you that his information, his results cannot be disseminated to anyone, cannot be told to me, cannot be told to the Court, until his work is checked. Little different than when you go to the doctor and a medical doctor looks at an EKG done by a technician and the EKS says you have a heart attack and the doctor says, oh, the EKG says you had a heart attack, I think we should do heart surgery. It's up to you to get that second opinion if you want or go with the opinion of a doctor that you trust.
> But in DNA it's not protocol anywhere for the evidence to be disseminated without a check of the work. He told you his work was checked.

The jury found Locascio guilty on all counts, and he received a total sentence of life imprisonment.

## D.    Direct Appeal

12

On direct appeal, Locascio argued, <u>inter alia</u>, that (1) he was entitled to new trial because of a pattern of prejudicial discovery violations by the state, including the mid-trial revelation of the blue shirt; (2) Johnson's testimony was improperly bolstered by evidence that Dr. Hass had co-read the DNA results; and (3) the State knowingly elicited false testimony from Johnson that he followed proper protocol when in fact Johnson violated testing verification protocol by reporting results to the prosecutor over the telephone before they were co-read by Dr. Hass.  The Florida Third District Court of Appeal ("Third DCA") summarily affirmed petitioner Locascio's conviction.

**E.    State Habeas Corpus Petition**

In February 2011, petitioner Locascio filed a <u>pro se</u> state petition for a writ of habeas corpus in the Third DCA, raising claims of ineffective assistance of appellate counsel for, <u>inter alia</u>, failing to raise on direct appeal the premature dissemination of the DNA test results of the blue shirt.  The Third DCA denied relief.

**F.    Rule 3.850 Motion**

In April 2011, petitioner Locascio filed a <u>pro se</u> motion for post-conviction relief, pursuant to Florida Rule of Criminal Procedure 3.850, in the state trial court. Petitioner Locascio's Rule 3.850 motion claimed, in relevant part, that he was denied due process at trial and that he received ineffective assistance of trial

counsel for failing to correct "Johnson's known false and perjured testimony" about the premature dissemination of the DNA test results before they were co-read, a violation of protocol.  Petitioner Locascio contended that this "evidence of the perjury" would have impeached "Johnson's credibility as a competent and trustworthy analyst" and cast doubt on the reliability of his DNA test results.

The state court denied relief.  As to petitioner Locascio's due process claim, the state court found that the trial transcript, in particular the Richardson hearing, "clearly shows that an appropriate inquiry was made," and that the Third DCA had already denied a similar claim that was raised in Locascio's state habeas petition. The Third DCA summarily affirmed.[2]

## G.    Section 2254 Petition

Locascio filed this pro se § 2254 petition, raising, inter alia, Giglio and ineffective assistance claims related to Johnson's testimony that he followed the co-read protocol before disseminating the DNA test results for the blue shirt. Locascio argued that he was prejudiced by the prosecutor's failure to correct Johnson's testimony and his trial counsel's failure to impeach Johnson because

---

[2]We need not decide here whether to look through to the state trial court decision or the summary Third DCA decision because it does not matter to the result.  This avoids any complications if the U.S. Supreme Court agrees or disagrees with our decision in Wilson v. Warden, Ga. Diagnostic Prison, 834 F.3d 1227, 1232-33 (11th Cir. 2016) (en banc), cert granted, 2017 WL 737820 (U.S. Feb. 27, 2017) (No. 16-6855).

14

Johnson's DNA evidence was the only evidence that placed him at the scene of the crimes.

The State responded that the Florida court's adjudication of both claims on the merits was not contrary to or an unreasonable application of federal law. As to the Giglio claim, the State noted that the trial court, at the Richardson hearing, determined that Locascio was not prejudiced by the State's mid-trial disclosure of DNA results on the blue shirt because other DNA evidence found at or near the scene implicated Locascio, and Locascio's defense theory would not change because of this additional DNA evidence. The issue of Johnson's testimony was raised on direct appeal and rejected. The State argued that the Florida appellate court: (1) accepted the trial court's finding that the prosecutor disclosed Johnson's unofficial results before the co-reading in order to provide the information to the defense as quickly as possible; and (2) determined that premature dissemination was acceptable under the circumstances given that Johnson's results were co-read and the final report provided to defense counsel, pursuant to protocol, before Johnson testified at trial. For the same reasons, the State contended, Locascio was not prejudiced by his defense counsel's decision not to impeach Johnson on this point.

The district court adopted the magistrate judge's report recommending that petitioner Locascio's § 2254 petition be denied. As to the Giglio claim, the district

15

court concluded that: (1) petitioner Locascio had not shown that the prosecutor knowingly used false testimony because there was no evidence Johnson was the lab worker who called the prosecutor and informed her of the unofficial DNA results before they were co-read by Dr. Hass; and (2) in any event, Johnson's testimony that all the DNA results were co-read prior to being disseminated was not material to either guilt or punishment because those results were subsequently co-read by Dr. Hass and made official. As to the ineffective counsel claim, the district court determined that even assuming trial counsel's cross-examination of Johnson was deficient, petitioner Locascio failed to show he was prejudiced for the same reasons his Giglio claim lacked merit. This appeal followed.

## II.    DISCUSSION

### A.    Standard of Review

In examining the denial of a 28 U.S.C. § 2254 petition, "we review questions of law and mixed questions of law and fact de novo, and findings of fact for clear error." Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1208 (11th Cir. 2007). When a state court denies relief on a federal constitutional claim, we presume "that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." See Harrington v. Richter, 562 U.S. 86, 99, 131 S. Ct. 770, 784-85 (2011). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could

disagree on the correctness of the state court's decision." Id. at 101, 131 S. Ct. at 786 (quotation marks omitted).

We follow a "general framework of substantial deference" when reviewing federal issues that state courts have decided. Diaz v. Sec'y for the Dep't of Corr., 402 F.3d 1136, 1141 (11th Cir. 2005). To grant a § 2254 petition, we must find not only that the petitioner's claims are meritorious, but also that the state court's judgment: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d); Guzman v. Sec'y, Dep't of Corr., 663 F.3d 1336, 1345-46 (11th Cir. 2011).

## B.    Giglio Claim

To prevail on a Giglio claim, a habeas petitioner must prove that: "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material[,] i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment" of the jury. Ford v. Hall, 546 F.3d 1326, 1332 (11th Cir. 2008) (internal quotation marks and ellipsis omitted); accord Guzman, 663 F.3d at 1348. The false testimony is material if it "could . . . in any reasonable likelihood have

17

affected the judgment of the jury." Giglio, 405 U.S. at 154, 92 S. Ct. at 766. This "could have" materiality standard "requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." Guzman, 663 F.3d at 1348 (quotation marks omitted).

Here, the state court's denial of Locascio's Giglio claim was not contrary to, or an unreasonable application of, clearly established federal law. Locascio identifies only one statement by DNA analyst Johnson that was false—that consistent with protocol, all of his DNA results in the case were co-read by Dr. Hass before they were provided to others. Locascio points out that earlier in the trial, during a side bar, the prosecutor admitted that the crime lab had called her to report preliminary results of the DNA testing on the blue shirt and that she then immediately passed those results on to defense counsel. Dr. Hass had not yet co-read those preliminary results because Dr. Hass was on vacation. Thus, Johnson's testimony was false with respect to the premature release of the DNA testing results for the blue shirt.

Even assuming Johnson's testimony on this point was knowingly false, it was not material. It is not reasonably likely that the fact that the crime lab (presumably Johnson) telephoned the prosecutor with the preliminary results of the DNA testing on the blue shirt before the co-reading or the fact that Johnson lied about it on the stand could have affected the jury's judgment about whether

18

Locascio was guilty or innocent.  There was a valid reason for the "premature dissemination," as Locascio calls it, on February 20, which was to alert the parties to the results as soon as possible because the trial had already started.  Further, the results were co-read by Dr. Hass and officially released to defense counsel on February 27, only one week later, and ten days before Johnson's March 10 trial testimony about his DNA testing.  Under these particular circumstances, it would have been more troubling had the crime lab waited another week for Dr. Hass to return from vacation and co-read the results.

Moreover, this one instance of "premature dissemination" does not call into question all of Johnson's DNA testing results, much less the DNA results for the blue shirt, which in fact were co-read and confirmed by Dr. Hass one week later and before the DNA evidence was actually introduced at trial.  Locascio does not point to any evidence suggesting that Johnson's DNA testing of the blue plaid shirt was flawed.  And, as the state trial court determined during the Richardson hearing, this new DNA evidence was cumulative of other DNA evidence that implicated petitioner Locascio in the murder of Maggie Locascio.

Indeed, the State's evidence of petitioner Locascio's guilt included, among other things, that petitioner Locascio traveled to Miami in his white pickup truck just before Maggie Locascio's murder, that two separate eye-witnesses saw a truck matching petitioner Locascio's truck near the murder scene around the time of the

murder, that petitioner Locascio's DNA was found on the handle of one of the murder weapons left next to the victim's body and also on a beige shirt and some latex gloves found with another of the murder weapons, that shortly after the murder, petitioner Locascio was captured on surveillance video with a dark stain on the back of his clothing, that after petitioner Locascio returned to North Carolina, the inside of his truck had been stripped of its seatcovers and washed, and that while in pre-trial detention, petitioner Locascio admitted to a cellmate that he had killed his sister-in-law.  In light of this evidence, there is no reasonable likelihood that the jury could have rejected all of the State's DNA evidence and acquitted petitioner Locascio, as he maintains, based on this one false statement by Johnson.

To be sure, it would have been better if the prosecutor had stopped Johnson and had him admit that, in fact, the preliminary results of one piece of evidence were provided to her before Dr. Hass co-read them and then had Johnson explain why and confirm that those results were co-read by Dr. Hass a week later and before Johnson's testimony.  But, under the circumstances, the prosecutor's failure to do so in this case was not prosecutorial misconduct warranting a new trial.  In short, under Giglio's materiality standard, Johnson's testimony, even if false as to the co-reading of the blue shirt DNA results, was not materially false and did not require a new trial.  Accordingly, the state court's denial of petitioner Locascio's

Giglio claim was not contrary to, or an unreasonable application of, clearly established federal law.

## C.    Ineffective Assistance Claim

To make a successful claim of ineffective assistance of trial counsel, a defendant must show that: (1) his counsel's performance was deficient; and (2) the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984). Prejudice is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068.

Locascio argues that his trial counsel was ineffective when he failed to impeach Johnson by asking him on cross-examination about his premature release of the DNA testing results for the blue shirt.[3] It is not clear that defense counsel's performance was deficient. Even though defense counsel was aware that Johnson was wrong when he testified that all of his DNA results were co-read by Dr. Hass before they were released, there are reasons why defense counsel might not have wanted to explore this misstatement with Johnson. Defense counsel knew that the reason for the premature release of the preliminary DNA results was to make sure

---

[3]Locascio also suggests in passing that his trial counsel also should have objected during the prosecutor's direct examination of Johnson and during her closing argument, but these issues are outside the scope of the COA and were not raised in his § 2254 petition filed in the district court. Thus, we do not address them. See Williams v. McNeil, 557 F.3d 1287, 1290 n.4 (11th Cir. 2009).

the parties—by then in mid-trial—had the results as soon as possible and could prepare accordingly. Defense counsel also knew that those results had been co-read by Dr. Hass subsequent to that release, and that he had obtained a lab report with the official results. Furthermore, defense counsel's strategy at trial was not to question whether and when the DNA results were co-read, but rather to highlight that co-reading was not the same as, and was inferior to, corroborative testing, and to stress that neither Dr. Hass nor anyone else independently had corroborated Johnson's DNA testing. Getting Johnson to admit that his results on the blue shirt were prematurely released before they were co-read by Dr. Hass would have done little to advance this theory of the defense.

Alternatively, even assuming arguendo that defense counsel's failure to draw out this concession from Johnson on cross-examination was deficient, there was a reasonable basis for the state court to deny relief. Notably, defense counsel cross-examined Johnson vigorously and extensively on his qualifications, his crime lab's methods of DNA analysis, and, perhaps most importantly, on his admitted violation of an anti-contamination protocol in 37 cases, including his testing of a white t-shirt in Locascio's case. Furthermore, as already discussed, the State presented compelling evidence of guilt, including other DNA evidence inculpating petitioner Locascio. As also already discussed, given the nature and circumstances

22

of that particular protocol violation, it would not have cast doubt on the validity of Johnson's DNA testing or on the rest of the state's evidence.

Accordingly, it cannot be said that but for defense counsel's failure to question Johnson about this one protocol violation, the outcome of petitioner Locascio's trial would have been different. For these reasons, the state court's denial of petitioner Locascio's ineffective assistance of trial counsel claim was not contrary to, or an unreasonable application of, Strickland.[4]

**AFFIRMED.**

---

[4]The Court denies petitioner Locascio's pro se motion filed on November 16, 2016, which we liberally construe as a motion for reconsideration of this Court's November 3, 2016 order denying his motions to file a comprehensive appendix and to enlarge the record on appeal. This Court generally does not consider material that was not before the district court. See CSX Transp., Inc. v. Garden City, 235 F.3d 1325, 1330 (11th Cir. 2000). Furthermore, the Court had full access to the entire district court record in reviewing petitioner's claims on appeal.