[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT. 27, 2011
JOHN LEY
CLERK

_____

No. 10-11442

_____

D.C. Docket No. 6:06-cv-01271-MSS-GJK

JAMES GUZMAN,

                                                        Petitioner-Appellee,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
FLORIDA ATTORNEY GENERAL,

                                                        Respondents-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 27, 2011)

Before TJOFLAT, MARCUS, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge:

In this death penalty case, Respondents-Appellees appeal the District Court's Order granting Petitioner Guzman a new trial based upon Brady[1] and Giglio[2] errors involving the State's payment of $500 in reward money to Martha Cronin, the state's key witness.[3]  As to the Giglio violation, Guzman argues that Cronin and the lead detective in this case, Allison Sylvester, both testified falsely at trial that Cronin received no benefit for her testimony against Guzman, other than being taken to a motel rather than to jail after she was arrested on unrelated charges.  With respect to the Brady violation, Guzman contends that the State failed to disclose that Cronin was paid a $500 reward for her testimony.  However, since we ultimately hold that the writ should issue based on Guzman's Giglio claim, thereby vacating his conviction, we need not decide his Brady claim. See Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1331 n.1 (11th Cir. 2011).

Because the Florida Supreme Court adjudicated and rejected Guzman's Giglio claim on the merits, we must determine whether the District Court, in granting Guzman habeas relief, violated the Anti-Terrorism and Effective Death

---

[1] Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963).

[2] Giglio v. United States, 405 U.S. 150, 154–55, 92 S. Ct. 763, 766 (1972).

[3] Although Guzman raised a number of different habeas claims in the District Court which were denied, he did not cross appeal.

Penalty Act's (AEDPA) deferential standards of review. More specifically, this appeal requires us to decide whether the state court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1). Because we hold that Guzman demonstrated an unreasonable application by the state court of the Giglio standard, we affirm the District Court's Order granting habeas relief.

As a preliminary matter, we observe that in this case, there are no issues of procedural bar, exhaustion, statute of limitations, or non-retroactivity often encountered in habeas cases. Neither are the facts themselves in dispute. Our limited role here is to apply the "materiality" standard of Giglio, which is a question of law not entitled a presumption of correctness under 28 U.S.C. § 2254(e). Moon v. Head, 285 F.3d 1301, 1310–11 (11th Cir. 2002). We now turn to the facts underlying Guzman's Giglio claim.

## I. FACTS AND PROCEDURAL HISTORY

On December 13, 1991, Guzman was arrested for the murder of David Colvin. Guzman's second trial began on December 2, 1996, and, in this trial,

3

Guzman waived his right to a jury in both the guilt and penalty phases of the trial.[4] After a bench trial before the Honorable William C. Johnson, Circuit Judge, Guzman was found guilty of first degree murder and armed robbery with a deadly weapon.[5] The trial court sentenced Guzman to death as to the murder count and to life imprisonment on the armed robbery count, with the sentences to run consecutively.[6]

As described by the Florida Supreme Court, the State presented the following evidence implicating Guzman as Colvin's murderer:

---

[4] Guzman was originally indicted on January 7, 1992, and, on September 25, 1992, a jury found Guzman guilty of robbery with a deadly weapon and first degree murder. Guzman was adjudicated guilty on both counts and sentenced to death on the murder conviction and to life imprisonment on the robbery conviction. The Florida Supreme Court subsequently reversed Guzman's convictions and death sentence and remanded for a new trial, holding that Guzman's right to a fair trial was violated because his public defender had a conflict of interest. See Guzman v. State, 644 So. 2d 996, 999 (Fla. 1994) (Guzman I).

[5] Judge Johnson also presided over the postconviction evidentiary hearing and issued the trial court orders denying Guzman relief.

[6] The Court stated:

In its sentencing order, the trial court found the following five aggravating circumstances: (1) Guzman was previously convicted of a felony involving the use of violence; (2) the murder was committed in the course of a robbery; (3) the murder was committed for the purpose of avoiding arrest; (4) the murder was committed in a cold, calculated, and premeditated manner (CCP); and (5) the murder was especially heinous, atrocious, or cruel (HAC).

Guzman II, 721 So. 2d at 1158. The trial court found no statutory mitigating circumstances, and, as nonstatutory mitigation, the trial court found that Guzman's alcohol and drug dependency was established but that it was entitled to little weight. Id.

4

Approximately one week prior to the murder, Guzman and Martha Cronin, a prostitute and crack cocaine addict, began living together at the Imperial Motor Lodge. Colvin also resided at the motel, and Guzman and Colvin became acquainted. On the morning of August 10, Colvin and Guzman left the hotel in Colvin's car. Guzman and Colvin first proceeded to a tavern and drank beer, then the men went to the International House of Pancakes and ate breakfast. Guzman testified that he and Colvin returned to the motel at approximately 12 noon. Guzman stated that he gave Colvin's car and room keys back to Colvin and returned to his room. Guzman testified that at approximately 3 p.m. Curtis Wallace gave him a diamond ring that he could sell or trade for drugs.[7] Guzman admitted that he gave the ring to Leroy Gadson in exchange for drugs and money.[8] However, Guzman denied any involvement in Colvin's robbery and murder.

Cronin's trial testimony contradicted Guzman's. Cronin testified that Guzman told her prior to the murder that Colvin would be easy to rob because he was always drunk and usually had money. Cronin stated that Guzman told her in another conversation that if he ever robbed anybody, he "would have to kill them" because "a dead witness can't talk." Cronin testified that Guzman was holding his survival knife at the time this statement was made. Cronin claimed that, on the morning of August 10, Guzman told her that he was going to drive Colvin to the bank. Cronin stated that Guzman returned to their room that morning and showed her Colvin's car keys and room keys. Cronin testified that at approximately 3 p.m. Guzman appeared at their room with a garbage bag that contained rags. Cronin said that Guzman looked upset, and that she asked him what was wrong. Cronin testified that Guzman responded, "I did it," and confessed to murdering Colvin. Cronin stated that Guzman told her that Colvin awakened while he was taking money from Colvin's room. Cronin testified that Guzman said that he hit

---

[7] While Guzman admitted that he possessed and sold Colvin's ring, the record demonstrates he testified he got it from Cronin, not Wallace.

[8] The State produced testimony at Guzman's trial that he sold a ring belonging to Colvin to Gadson on August 10, 1991. Gadson testified that he was contacted by Guzman at approximately 4:00 or 5:00 p.m. on August 10, 1991.

Colvin in the head and then stabbed him with the samurai sword. Cronin stated that Guzman showed her a diamond ring and money that he had taken from Colvin.[9] Cronin also stated that Guzman said he committed the murder for her.

Upon questioning by the police shortly after the discovery of Colvin's body, Guzman and Cronin both claimed to know nothing about the murder. In the latter part of November 1991, Cronin informed the police that Guzman had confessed to her that he killed Colvin. Cronin testified that Guzman had instructed her to tell the police that she knew nothing about the murder. Cronin also testified that she did not come forward earlier because Guzman threatened to harm her if she revealed what she knew about the crime. Guzman admitted that he told Cronin prior to his first trial to "do the right thing girl-it's a small world." Paul Rogers and Guzman became friends while sharing a jail cell in the Spring of 1992. Rogers testified that Guzman confessed to him that he robbed and killed Colvin. Rogers said that Guzman told him that he used Colvin's key to enter his room after the men returned from drinking, and that Colvin awakened while Guzman was robbing him. Rogers further testified that Guzman stated that, after Colvin sat up in the bed, Guzman struck Colvin ten or eleven times with the sword. Rogers stated that Guzman said he cleaned the sword and put "everything" in a garbage bag which he disposed of in a dumpster. Rogers also stated that Guzman admitted that he took Colvin's ring and some money and traded the ring for drugs. Guzman allegedly told Rogers that he robbed and

---

[9] Apart from Cronin's testimony, there was also evidence that Guzman possessed Colvin's ring and traded it for drugs and money after Colvin was killed. But there were only two different factual versions of how Guzman came into possession of the ring on August 10, 1991, both of which were presented at Guzman's trial: one from Cronin and one from Guzman. Cronin testified that Guzman showed her the ring when he came back to their motel room and confessed to killing Colvin. In contradiction, Guzman testified that Cronin turned a trick inside their motel room while he waited outside. After Cronin was finished, Guzman came into the room and Cronin gave him $50 and then told Guzman she was going to see Curtis Wallace and buy some drugs. Id. When Cronin returned, she had a ring in her hand and Wallace was with her. According to Guzman's testimony, Cronin told Guzman that Wallace wanted to trade the ring for crack cocaine. Guzman testified that he believed that the ring belonged to Wallace and admits that he, Guzman, sold the ring to Leroy Gadson for $250 and a quantity of cocaine, which he shared with Wallace and Cronin.

6

> killed Colvin so Cronin would not have to earn money as a prostitute. Rogers said that Guzman threatened to kill him and his family if he informed the police about his knowledge of the murder.

Guzman II, 721 So. 2d at 1157–58. On direct appeal, the Florida Supreme Court affirmed Guzman's convictions and sentences, although it held that the evidence did not support the cold, calculated, and premeditated aggravating circumstance. Id. at 1156. The United States Supreme Court denied certiorari. Guzman v. Florida, 526 U.S. 1102, 119 S. Ct. 1583 (1999).

After his direct appeal became final, Guzman filed a timely motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, which he later amended to include a Brady and Giglio claim involving the false testimony of Cronin and the withholding of evidence from the defense concerning a $500 reward paid to Cronin. The state trial court granted Guzman an evidentiary hearing as to his Brady and Giglio claim, as well as a few others, and denied his remaining claims. In support of his various claims, Guzman presented the testimony of eight witnesses and introduced several exhibits during the state evidentiary hearing. Martha Cronin did not testify at the evidentiary hearing.

Based upon the facts adduced at trial and the state evidentiary hearing, the District Court summarized the following facts significant to Guzman's Brady and Giglio claim:

At trial, Detective [Allison] Sylvester testified that she questioned Ms. Cronin on August 12, 1991, and that Ms. Cronin failed to offer any information pertaining to the case. On September 24, 1991, Ms. Cronin was questioned by Detective Sylvester and, again, she denied any information about the homicide. [FN5] . . . Ms. Cronin provided a statement late on November 23, 1991, and into November 24, 1991, near midnight implicating Petitioner as the perpetrator of the homicide. Ms. Cronin had an active warrant for her arrest on November 24, 1991, due to an outstanding warrant for violation of probation. Ms. Cronin was seeking a "deal," but the assistant state attorney handling the case instructed Detective Sylvester to arrest. Detective Sylvester rejected this directive and did not arrest Ms. Cronin. Instead, Ms. Cronin was taken to a hotel and provided with food, which was paid for by the Daytona Beach Police Department, in order to keep "an eye on her while [they] finished [up] following up . . . information." However, Ms. Cronin left the hotel on November 24, 1991, without permission, and law enforcement lost contact with her. Ms. Cronin engaged in prostitution and used crack cocaine after she left the hotel.

> FN5. Ms. Cronin confirmed in her trial testimony that she told law enforcement on August 12, 1991, and on September 24, 1991, that she knew nothing about the homicide.

Detective Sylvester then arrested Ms. Cronin on November 27, 1991, for outstanding warrants for violation of probation. When Ms. Cronin was arrested on November 27, 1991, Detective Sylvester was afraid that Ms. Cronin would flee, and Detective Sylvester admitted that Ms. Cronin was arrested because she was the prime witness and was needed for the case. Ms. Cronin was, nevertheless, released from jail on December 5, 1991. Petitioner was arrested on December 13, 1991.

Ms. Cronin testified before the grand jury against Petitioner on January 11, 1992. At the trial, Detective Sylvester denied that she, law enforcement, or the State Attorney's office had offered [Ms. Cronin] any deals in exchange for her testimony. Ms. Cronin also denied ever receiving a deal from law enforcement, although she acknowledged

being placed in a hotel room for protection.

At the Rule 3.850 evidentiary hearing, however, after defense investigation had revealed a payment had been made to Ms. Cronin, Detective Sylvester conceded that, on January 3, 1992, just eight days before Ms. Cronin testified before the grand jury she delivered a money order to the Volusia County Jail in the sum of $500 made payable to Ms. Cronin. The money was placed in Ms. Cronin's prison account where she was incarcerated and was provided to her because she had provided information leading to the arrest of Petitioner. Detective Sylvester denied that Ms. Cronin was paid for her testimony. Detective Sylvester could not recall when the reward money had first been offered to Ms. Cronin. However, the reward was originally offered on August 16, 1991, for information "about a man stabbed to death in his motel room." The reward offer was published in the Daytona Beach News-Journal and the Orlando Sentinel. Detective Sylvester recalled that Ms. Cronin's mother contacted her on January 2, 1992, "asking if it were possible for [Detective Sylvester] to obtain the reward money to get it to [Ms. Cronin] in case she got out when she went to court that day." Detective Sylvester testified that she had not disclosed to the prosecuting attorney the $500 reward paid to Ms. Cronin. The prosecutor denied any knowledge of the $500 reward.

Guzman v. Sec'y, Dep't Corrs., 698 F. Supp. 2d 1317, 1322–23 (M.D. Fla. 2010) (citations omitted).

After the state court evidentiary hearing, the trial court denied all of Guzman's remaining claims, including his Giglio claim in a written Order on March 4, 2002. In rejecting Guzman's Brady and Giglio claims, the state trial court used the same materiality standard for both claims, stating:

This Court finds that these allegations do not satisfy the tests for a sufficient Brady, Giglio, or ineffective assistance of counsel claim.

9

Trial counsel extensively cross-examined Cronin, for over 88 pages of trial transcripts . . . . Thus, this Court was aware of the fact that Cronin had made an agreement with the State to testify against Defendant. Further, there was other evidence of Defendant's guilt apart from Cronin's testimony.

Therefore, this Court finds that there is not a reasonable probability that had the information regarding the $500.00 reward paid to Cronin been disclosed to Defendant, the result of the proceeding would have been different. Further, this Court finds that this statement regarding the $500.00 reward being paid to Cronin is immaterial because there is not a reasonable probability that the false evidence would put the whole case in such a different light as to undermine the confidence in the verdict.

Guzman appealed to the Florida Supreme Court and separately filed a state petition for writ of habeas corpus. The Florida Supreme Court remanded Guzman's Giglio claim to the trial court because that court's "resolution of the Giglio claim [did] not sufficiently reflect the standard appropriate to a Giglio claim" inasmuch as the trial court's order failed to adequately distinguish between the Brady standard and the Giglio standard in considering and deciding the Giglio claim. Guzman v. State, 868 So. 2d 498, 507 (Fla. 2003) (Guzman III). The Florida Supreme Court denied the remaining claims in both the appeal and the petition for writ of habeas corpus, including Guzman's Brady claim. Id. at 508–11. With respect to the Brady claim, the court identified the federal Brady standard and held that the $500 was favorable evidence as impeachment against

10

Cronin. Id. at 508. The court also determined that the evidence was suppressed,

noting Guzman had filed a "specific discovery demand requesting from the State

all agreements or any consideration given to a State witness, and the State's

written response stated that Cronin received no 'agreements, assurances of

nonprosecution or leniency, offers, benefits or understandings.'"[10] Id. But the

state court denied relief because it determined that although the State suppressed

favorable impeachment evidence, the withheld evidence was not material. Id. at

508–09.

On remand, the trial court once again denied Guzman relief on his Giglio

claim in a written order finding that the evidence was immaterial under Giglio

---

[10] On June 25, 1996, several months before trial, Guzman's counsel filed a motion for disclosure of impeachment evidence. In that motion, Guzman specifically requested disclosure of the following:

> 1. The substance of any and all statements, agreements, offers or discussions had with any of the State's witnesses or a suggestion of . . . compensation . . . or any other offer to benefit accruing to said individual whatsoever in exchange for their cooperation, assistance of testimony of testimony in the trial herein.

> 2. Any and all consideration or promises of consideration given to or made on behalf of government witnesses. By 'consideration,' [Guzman] refers to absolutely anything of value or use . . . and anything else which could arguably create an interest or bias in the witness i[n] favor of the State or against the defense or act as an inducement to testify or to color testimony.

On December 2, 1996, the first day of Guzman's retrial, the state filed a Statement of Particulars re: State Witnesses, which stated, in relevant part: "[t]hat Martha Cronin has been subpoenaed as a witness for trial in this cause and, as such, has use immunity for her testimony. There are no further agreements, assurances of non-prosecution or leniency, offers, benefits, or understandings between the State of Florida and Martha Cronin."

11

"due to the ample impeachment and corroboration of Cronin's testimony, and the independent evidence of [Guzman's] guilt." The trial court also determined that the false evidence was harmless beyond a reasonable doubt. In support, the trial court explained:

> The Court determines that in light of the significant impeachment evidence presented at trial and the other evidence of Guzman's guilt, the evidence of the State's $500.00 reward to Martha Cronin would have been merely cumulative and immaterial. The record herein contains other evidence of Guzman's guilt apart from Cronin's testimony.
>
> Dr. Terrance Steiner, then interim medical examiner for Volusia County, testified at trial that Colvin's sword recovered from the room could have inflicted some of the wounds to Colvin's body, and that Guzman's survival knife could have inflicted other wounds to Colvin's body.
>
> Paul Rogers, the jailhouse witness who shared a jail cell with Guzman, corroborated Cronin's testimony. Paul Rogers testified that Guzman confessed to him that he robbed and killed Colvin. The record reflects that it is undisputed that Guzman possessed Colvin's ring and traded it for drugs and cash.
>
> Guzrnan's trial counsel presented significant impeachment evidence against Cronin during cross-examination. Specifically, Cronin was impeached on: her initial claim to know nothing about Colvin's murder upon questioning by the police after the discovery of Colvin's body; her attempt to make a deal with the State after her arrest, in exchange for her damaging testimony against Guzman; her discontentment with Guzman's association with other female acquaintances; her numerous arrests for prostitution; her addiction to crack cocaine.

Guzman also presented the testimony at trial from Carmelo Garcia. Garcia testified that Cronin told him she had lied to the police about Guzman murdering Colvin.

After evaluating the State's $500 payment to Cronin in light of the other evidence presented at trial, the Court concludes that the evidence of the $500 payment to Cronin was immaterial under Giglio. The Court concludes that there was no reasonable likelihood that the false testimony regarding the $500 payment to Cronin could have affected the court's judgment as factfinder.

The Florida Supreme Court affirmed the trial court's denial of Guzman's Giglio claim in a written opinion. Guzman v. State, 941 So. 2d 1045 (Fla. 2006) (Guzman IV). After identifying the Giglio standard, the court determined that the evidence was immaterial.[11] Id. at 1050–52.

Guzman timely filed a federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the District Court for the Middle District of Florida, in which he raised a number of constitutional claims, including his Brady and Giglio claims. After briefing by the parties, and without an evidentiary hearing, the District Court granted Guzman a new trial based upon his Brady and Giglio claims and denied relief on his remaining claims.[12] See Guzman, 698 F. Supp. 2d at 1333–35. In

---

[11] The Florida Supreme Court's statement of reasons in support of its decision will be discussed in greater detail below.

[12] The District Court decided Guzman's claim based exclusively upon the facts which were developed in the State court proceedings without holding a federal evidentiary hearing. Like the District Court, our review under 28 U.S.C. § 2254(d)(1) is limited to the record that was before the State court that adjudicated Guzman's claim on the merits. See Cullen v. Pinholster,

13

granting habeas relief, the District Court determined that the Florida Supreme Court had correctly identified <u>Brady</u> and <u>Giglio</u> as providing the standard for adjudication of Guzman's claims. <u>Id.</u> But after carefully reviewing the factual record developed in the state court proceedings, both at trial and in postconviction, the District Court found that the false testimony was material under both <u>Brady</u> and <u>Giglio</u>. <u>Id.</u> Further, the court found that Guzman had shown the testimony was not harmless beyond a reasonable doubt and that it had a substantial injurious effect in determining the trial court's verdict. <u>Id.</u> The District Court therefore concluded that Guzman had shown that the decision of the Florida Supreme Court was contrary to, or an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court and was otherwise based on an unreasonable determination of the facts in light of the evidence presented. <u>Id.</u> at 1333–35.

## II. STANDARDS OF REVIEW

A district court's grant or denial of a habeas corpus petition is reviewed <u>de novo</u>. <u>Ward v. Hall</u>, 592 F.3d 1144, 1155 (11th Cir. 2010). Because Guzman filed his federal petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Act of 1996

---

---U.S.---, ---, 131 S. Ct. 1388, 1398 (2011).

14

(AEDPA). See Henderson v. Campbell, 353 F.3d 880, 889–90 (11th Cir. 2003).

AEDPA "imposes a highly deferential standard for evaluating state-court rulings"

and "demands that state-court decisions be given the benefit of the doubt." Renico

v. Lett, ---U.S.---, ---, 130 S. Ct. 1855, 1862 (2010) (quotation marks omitted).

Because Guzman seeks habeas relief under 28 U.S.C. § 2254 based upon claims

that were adjudicated on the merits by the state courts, we are restricted in our

ability to grant relief by § 2254(d). Cave v. Sec'y, Dep't of Corrs., 638 F.3d 739,

742 (11th Cir. 2011). To grant Guzman's habeas petition, we must find not only

that Guzman's constitutional claims are meritorious, but also that the state court's

resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Cave, 638 F.3d at 742–43. The Supreme Court has

recognized that § 2254(d)(1)'s "contrary to" and "unreasonable application"

clauses have independent meaning. Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct.

1843, 1850 (2002).

15

A state court's decision is "contrary to" clearly established Supreme Court precedent in either of two respects: (1) "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405–06, 120 S. Ct. 1495, 1519–20 (2000).

To determine whether a state court decision is an "unreasonable application" of clearly established federal law, the Supreme Court recently stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree" on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

Harrington v. Richter, --- U.S. ---, ---, 131 S. Ct. 770, 785–86 (2011) (citation and quotation marks omitted) (emphasis in original).

16

In addition, a state court's factual determination is entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1). The AEDPA's "statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations of law and fact." Parker v. Head, 244 F.3d 831, 836 (11th Cir. 2001); Hallford v. Culliver, 459 F.3d 1193, 1199 (11th Cir. 2006). A determination of "materiality" for a Brady violation is a question of law not entitled to a presumption of correctness. Moon, 285 F.3d at 1310–11.

Ultimately, before a federal court may grant habeas relief under § 2254(d), "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, ---U.S. at ---, 131 S. Ct. at 786–77. In order to make this determination under § 2254(d),

> a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court.

Id. at 786 (emphasis added). We emphasize, however, that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits." Id. at ---, 131 S. Ct. at 785 (quotation marks

17

omitted). But where the state courts have taken the time and resources to issue an opinion explaining their decision, a federal court must consider it and give it deference.[13] " Id. at ---, 131 S. Ct. at 786–77.

Finally, a habeas petition will only be granted if the Constitutional violation at the trial level resulted in "actual prejudice" to the petitioner. Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 1722 (1993). The alleged error must have had a "substantial and injurious effect or influence in determining the jury's verdict." Id. at 637–38, 113 S. Ct. at 1722–33 (quotation marks omitted).

## III. DISCUSSION

We begin by noting that the "clearly established federal law" relevant to

---

[13] Indeed, since AEDPA became law, federal courts have expressly considered the reasoning of state courts in determining that a state court's decision was contrary to, or an unreasonable application of, clearly established federal law under 28 U.S.C. § 2254(d). See, e.g., Porter v. McCullom, --- U.S. ---, ---, 130 S. Ct. 447, 454 (2009) (finding the Florida Supreme Court's explicated decision in Porter v. State, 788 So. 2d 917 (2001), was an unreasonable application of the general Strickland standard, where the state court "either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing"); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (per curiam) (indicating that § 2254 does not preclude relief if either "the reasoning [or] the result of the state-court decision contradicts [our cases]"); Williams, 529 U.S. at 407-08, 120 S. Ct. at 1520 (stating application unreasonable where state court "correctly identifies the governing legal rule but applies it unreasonable to the facts of a particular prisoner's case"); Smith, 572 F.3d 1327 (carefully examining Florida Supreme Court's written decision which had denied capital habeas petitioner relief on Brady and Giglio claims, then holding that state court's rejection of petitioner's Brady claim was unreasonable); Ventura v. Atty. Gen., Fla., 419 F.3d 1269, 1281–82 (11th Cir. 2005) (analyzing a Giglio claim under § 2254(d) and stating "whether the state court reached a conclusion of law that contradicts one reached by the Supreme Court-requires a careful analysis of the Florida Supreme Court's decision").

Guzman's claims was firmly established by United States Supreme Court holdings long before Guzman's trial and postconviction proceedings.[14]  As long ago as Mooney v. Holohan, 294 U.S. 103, 112, 55 S. Ct. 340, 342 (1935), the Supreme Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." In Napue v. Illinois, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959), the Supreme Court explained, "[t]he same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."  Thereafter, Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963), held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."[15]

---

[14]  The phrase "clearly established Federal law" in §2254(d)(1) encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." Williams, 529 U.S. at 412, 120 S. Ct. at 1523; see also Schwab v. Crosby, 451 F.3d 1308, 1324 (11th Cir. 2006).

[15]  In 1976, the Supreme Court clearly established that "a defendant need not request favorable evidence from the State to be entitled to it."  Smith v. Sec'y Dept. Corrs., 572 F.3d 1327, 1333 -1334 (11th Cir. 2009) (citing United States v. Agurs, 427 U.S. 97, 103–07, 96 S. Ct. 2392, 2397–99 (1976).

19

Giglio, 405 U.S. at 154, 92 S. Ct. at 766 (citing Napue, 360 U.S. at 269, 79 S. Ct. at 1177).  But we do not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict."  Id. (quotation mark omitted).  "A finding of materiality of the evidence is required under Brady."  Id.

Guzman claims that there was both a Giglio violation and a Brady violation at his trial.  Although the two claims are related, each claim is different and has its "own standard for determining whether the undisclosed evidence [was] material."  Smith, 572 F.3d at 1333– 34.  As noted above, we only decide Guzman's Giglio claim in this opinion.

To establish a Giglio claim, a habeas petitioner must prove: "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could . . . have affected the judgment."  Ford v. Hall, 546 F.3d 1326, 1332 (11th Cir. 2008) (quotation marks omitted).  For Giglio violations, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the

judgment of the jury."[16]  Agurs, 427 U.S. at 103, 96 S. Ct. at 2397. "The could

have standard requires a new trial unless the prosecution persuades the court that

the false testimony was harmless beyond a reasonable doubt." Smith, 572 F.3d at

1333–34.  Giglio's materiality standard is "more defense-friendly" than Brady's.

Hammond v. Hall, 586 F.3d 1289, 1306 n.4 (11th Cir. 2009).

By comparison, in Guzman's case, the Florida Supreme Court stated the

Giglio test as follows: "[t]o establish a Giglio violation, it must be shown that: (1)

the testimony given was false; (2) the prosecutor knew the testimony was false;

and (3) the statement was material."  Guzman IV, 941 So. 2d at 1050 (citations

omitted).  This formulation of the Giglio test is substantially the same as ours,

except we combine the state court's first and second component into our first

prong.  Because the Florida Supreme Court correctly identified the governing legal

---

[16]  Although Giglio's materiality standard is stated in general terms and the Florida
Supreme Court correctly identified the standard, that does not mean its "application was
reasonable." Panetti, 551 U.S. at 953, 127 S. Ct. at 2858.  As the Supreme Court has explained
with respect to § 2254(d)'s unreasonable application prong:

> AEDPA does not require state and federal courts to wait for some nearly identical
> factual pattern before a legal rule must be applied.  Nor does AEDPA prohibit a
> federal court from finding an application of a principle unreasonable when it involves
> a set of facts different from those of the case in which the principle was announced.
> The statute recognizes, to the contrary, that even a general standard may be applied
> in an unreasonable manner.

Id. at 953, 127 S. Ct. at 2858 (citations and quotation marks omitted).

principle from the Supreme Court's decisions and we have not identified a

Supreme Court case with materially indistinguishable facts, we must determine

whether the state court unreasonably applied it to Guzman's facts. Bell, 535 U.S.

at 694, 122 S. Ct. at 1850.

The Florida Supreme Court held that "[t]he first two prongs of the Giglio

test are satisfied in this case." Guzman III, 868 So. 2d at 505; Guzman IV, 941 So.

2d at 1050. The Florida Supreme Court explained its conclusion:

> Both Cronin and [Detective Sylvester] testified falsely at trial that
> Cronin received no benefit for her testimony against Guzman other than
> being taken to a motel rather than jail when she was arrested. In fact, the
> State paid Cronin $500, a significant sum to an admitted crack cocaine
> addict and prostitute. The knowledge prong is satisfied because the
> knowledge of the detective who paid the reward money to Cronin is
> imputed to the prosecutor who tried the case.

Guzman III, 868 So. 2d at 505 (citations omitted). We agree with the Florida

Supreme Court's conclusions with respect to Giglio's first two prongs. Here, the

record fully supports that Cronin and Detective Sylvester testified falsely at

Guzman's trial that Cronin received no benefit other than being taken to a motel

and not arrested, yet Cronin was in fact paid a $500 reward. Although Detective

Sylvester testified at the postconviction hearing that she could not recall if she

disclosed to the trial prosecutor that she had paid Cronin a $500 reward,

Sylvester's knowledge of this evidence was imputed to the prosecutor. See Kyles

22

v. Whitley, 514 U.S. 419, 437–38, 115 S. Ct. 1555, 1567–68 (1995) (holding that a "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation . . . the prosecution's responsibility for failing to disclose known, favorable evidence . . . is inescapable.").

However, after carefully reviewing the transcripts from Guzman's trial and evidentiary hearing and the trial court's orders, we hold that the Florida Supreme Court's materiality determination was more than just incorrect—it was an objectively unreasonable application of clearly established Supreme Court precedent. The state trial court initially found that "there was [not] a reasonable probability that the false evidence would put the whole case in such a different light as to undermine confidence in the verdict." On appeal, the Florida Supreme Court found that its precedent with respect to Brady and Giglio "lacked clarity," which resulted in "some confusion and merging of the Giglio and Brady materiality standards." Guzman, 868 So. 2d at 506. The Florida Supreme Court then clarified the two standards and remanded the case to the trial court for reconsideration of Giglio's materiality standard, which it clarified as, "whether

23

there is any reasonable likelihood that the false testimony could have affected the court's judgment as the factfinder in this case." Id.

On remand, the trial court found that the State's $500 payment to Cronin was immaterial under Giglio. As noted above, the trial court "determin[ed] that there [was] no reasonable likelihood that the false testimony could have affected the judgment of the [c]ourt and that the State had met its burden of showing that the false evidence was "harmless beyond a reasonable doubt." The Florida Supreme Court affirmed, reasoning as follows:

> The circuit judge denied Guzman's claim on the grounds that the false testimony was not material. To affirm this determination, we have to conclude that there is no reasonable possibility that the false testimony of Cronin and Detective Sylvester regarding the $500 reward affected the verdict. That standard has been met here. For the reasons relied upon by the trial court, we conclude that the State has established beyond a reasonable doubt that the false testimony of the witnesses had no effect on the verdict.

> The trial court found Cronin's credibility as a witness was amply impeached and that Cronin's testimony incriminating Guzman was independently corroborated and supported at trial. Our own de novo review of the record supports these conclusions. Indeed, impeachment of Cronin was substantial. She testified about her crack cocaine addiction, numerous arrests for prostitution, and agreement to testify against Guzman in exchange for a lesser charge on prostitution. She also acknowledged that she told witness Garcia that Guzman had not killed anyone but that she had lied to the police in accusing Guzman because she had been arrested and that she was angry with Guzman over his relations with other women. The judge also received evidence that the State had paid for a motel room and meals for Cronin. [FN3] In light of

24

this ample impeachment, the circuit judge was justified in concluding that Cronin['s] and Detective Sylvester's false testimony regarding the $500 reward was of "limited significance" and "merely cumulative and immaterial." We agree with this conclusion. The addition of the truthful testimony about the $500 reward would not have made a material difference in Cronin's credibility to the finder of fact.

> FN3. Notably, during the evidentiary hearing on the initial postconviction motion, Guzman's defense counsel revealed that, prior to trial, Guzman made him aware of allegations that Cronin had received the $500. Defense counsel chose not to pursue discovery or questioning at trial regarding the allegations.

Guzman IV, 941 So. 2d at 1050–52 (footnote omitted).

Like the District Court, we fully recognize that Cronin was impeached during her trial testimony by defense counsel. See Guzman, 698 F. Supp. 2d at 1331–32. But even taking this impeachment evidence into account, it was objectively unreasonable for the state court to conclude that Cronin's impeachment was so complete that "there is no reasonable possibility that the false testimony regarding the $500 reward could have affected the judgment of the factfinder." Guzman IV, 941 So. 2d at 1051.

As the Florida Supreme Court observed, a payment of $500 is a significant sum to an admitted crack addict. Guzman III, 868 So. 2d at 505; see also Guzman IV, 941 So. 2d at 1056 (Anstead, J., dissenting). We agree with the District

25

Court's conclusion that the $500 payment would have provided "substantial and specific evidence of Ms. Cronin's motivation to lie against [Guzman]:"

> The $500 payment was more than just another avenue of impeachment against an already discredited witness. The fact that the lead detective and the lead witness twice denied the existence of the payment is at least a tacit admission that it was perceived to have relevance to a reasonable fact finder viewing the credibility of this witness.

Guzman, 698 F. Supp. 2d at 1332. The state court's conclusion to the contrary is objectively unreasonable for several reasons.

First, we are mindful that the Florida Supreme Court's materiality determination also relied upon a finding that Cronin's testimony regarding Guzman's guilt was independently corroborated and supported by other evidence. See Guzman IV, 941 So. 2d at 1051. In support, the Florida Supreme Court relied upon the following:

> [i]n particular, the testimony of both Dr. Steiner and Rogers supports the circuit judge's finding. Dr. Steiner, the medical examiner, supported Cronin's testimony at trial by testifying that the samurai sword and the survival knife could have caused the victim's injuries. Rogers, the jailhouse witness who shared a cell with Guzman, testified that Guzman admitted committing the crime. It is also undisputed that, shortly after the murder, Guzman sold the victim's ring to Leroy Gadson, a known drug dealer, for drugs and cash. This evidence of Guzman's guilt, wholly independent of Cronin, supports her testimony. In light of this independent and corroborating evidence, we conclude that there is no reasonable possibility that the false testimony regarding the $500 reward could have affected the judgment of the factfinder

Id. But we must also consider the cumulative effect of the false evidence for the purposes of materiality. Kyles, 514 U.S. at 436–7 n.10, 115 S. Ct. at 1567 n.10; Smith, 572 F.3d at 1334. "Considering the undisclosed evidence cumulatively means adding up the force of it all and weighing it against the totality of the evidence that was introduced at the trial." Id. (emphasis added). Thus, we must also consider the fact that Rogers was a seven-time convicted felon and recanted before trial, providing an affidavit under oath on August 26, 1992, stating that Guzman "had never confessed to me about the case." Significantly, Rogers was aware of and had access to Guzman's court records about the case in his cell. Also, as explained above, Guzman admitted to possessing and selling Colvin's ring, but testified he got if from Cronin. Further, although the Florida Supreme Court viewed the medical examiner's testimony as important, we must also consider that "the medical examiner also testified that the victim's wounds were 'consistent with *any* knife three to four inches at least in length or knife-like object' and that he was unable to identify the 'exact weapon that may have inflicted a particular wound.'" See Guzman, 698 F. Supp. 2d at 1335.

Additionally, although the degree to which Cronin may have been impeached at trial is relevant to the materiality inquiry, we emphasize "the effect of these other means of impeachment was not, however, to render" evidence of

27

Cronin's reward and perjury cumulative.[17] See Ventura, 419 F.3d at 1291 n.9;

United States v. Sanfilippo, 564 F.2d 176, 178 (5th Cir. 1977) ("The fact that the

history of a witness shows that he might be dishonest does not render cumulative

evidence that the prosecution promised immunity for testimony.  A jury may very

well give great weight to a precise reason to doubt credibility when the witness

has been shown to be the kind of person who might perjure himself.");[18] see also

Brown v. Wainwright, 785 F.2d 1457 (11th Cir. 1986).

In concluding that the Florida Supreme Court unreasonably applied Giglio

in this case, we acknowledge that AEDPA modified our standard for reviewing

state court decisions on legal issues from de novo to reasonableness.  Further, we

fully acknowledge that our own prior decisions, "even one with a holding directly

on point, does not clearly establish federal law for § 2254(d)(1) purposes."  Allen

v. Sec'y, Dep't Corrs., 611 F.3d 740, 764 (11th Cir. 2010); Renico, --- U.S. at ---,

_____

[17] In Ventura, this Court denied a habeas petitioner's Giglio claim after finding the state court's rejection of that claim was not contrary to, or an unreasonable application of, clearly established federal law. 419 F.3d at 1269.  More specifically, Ventura determined that the state court's conclusion that Ventura's Giglio claim was not material was not "'objectively unreasonable' in light of the extensive and powerful corroborating evidence introduced and the substantial impeachment" of the witness. Id. at 1286.  In so doing, Ventura expressly recognized the context-specific nature of Giglio claims. Id.  Because Guzman's case lacks "extensive and powerful corroborating" evidence as demonstrated throughout this opinion, the context in Guzman's case is radically different from Ventura.

[18] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981.

28

130 S. Ct. at 1865–66. Our pre-AEDPA decisions may, however, illustrate how clearly established Supreme Court precedent applies to similar facts. Hart v. Attorney General of Florida, 323 F.3d 884, 894 n.20 (11th Cir. 2003). In this regard, Davis v. Zant, 36 F.3d 1538 (11th Cir. 1994), provides a useful illustration.

In Davis, a co-defendant, who was tried jointly with the petitioner, had confessed to the murder, but the trial court barred admission of the confession because the co-defendant would not be testifying at trial. Id. at 1543–46. The petitioner—who had initially confessed to the murder—testified at trial to explain why he now recanted that confession; he had confessed to save the co-defendant, but realized that the co-defendant's subsequent confession rendered his effort futile. When the petitioner alluded to the existence of the co-defendant's confession during his testimony, the prosecutor exclaimed "that's a lie"— suggesting that the co-defendant never confessed. Id. at 1546. Then, during closing argument, the prosecutor repeatedly intimated that the defense's recantation defense had been thought up on the day of his testimony—reinforcing the false assertion that the co-defendant had never confessed. Id. at 1547–49. To obtain the § 2254 writ, the petitioner was required to show "a reasonable probability that, but for the prosecutor's statements, the result of the proceeding would have been different." Id. at 1545 (citation omitted). We granted the writ,

in part because of weakness of the prosecution's circumstantial case and the intentional nature of the prosecutor's missrepresentations.  Id. at 1549–1551.

Although Davis involved a claim of prosecutorial misconduct, the materiality standard we applied in Davis is certainly more demanding than the standard for Giglio violations.  Under Giglio, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  Agurs, 427 U.S. at 103, 96 S. Ct. at 2397.  Thus, the fact that, in a similar factual circumstance, Davis found error under the more demanding standard sheds light on the "reasonableness" inquiry under AEDPA.  As demonstrated throughout this opinion, Guzman's case, like Davis's, involves evidence that "hinged on the jury's credibility determination," Davis, 36 F.3d at 1550, i.e., whether the jury believed Guzman's version of events, or whether it believed the contrary inferences arising from the state's circumstantial evidence and Cronin's testimony.  Because we found in Davis, that similarly fundamental prosecutorial misconduct coupled with weak evidence would have resulted in a different verdict—as dictated by clearly established Supreme Court standards—we logically would have to also find that Cronin's and Sylvester's false testimony "could have affected the judgement of the jury."  It is thus unreasonable for another court to look at the same evidence and conclude that

30

there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury."

Second, the Florida Supreme Court's materiality determination unreasonably discounted not only the fact that Cronin was the State's key witness in the case, but also the fact that her credibility was critical to the State's case against Guzman. One need only read the Florida Supreme Court's assessment of the evidence in Guzman's direct appeal opinion, as set forth above, supra at 5–6, to confirm that Cronin's testimony was critical to the State's case. Guzman II, 721 So. 2d at 1157–58. Most importantly, Cronin's trial testimony was especially significant because it directly contradicted Guzman's trial testimony in a manner that can only be considered material to the question of Guzman's guilt by fair minded jurists. Guzman testified on his own behalf and denied his participation in any respect with this robbery–murder. Id. at 1157. As set out above, although Guzman admitted that he possessed and sold Colvin's ring, he claimed he got it from Cronin. Cronin's testimony was inapposite in all material respects. Id.; see also, Guzman, 941 So. 2d at 1056 (Anstead, J., dissenting) ("The bottom line is that Cronin was *the* key witness in the case and the credibility of her testimony was critical to the State's case against Guzman."). But the state courts failed to consider the reasonable likelihood that an objective factfinder could have

31

reasonably disbelieved Cronin's testimony because of the $500 reward and because her prior statements were quite different from what she said at trial, and instead, given sufficient credence to Guzman's testimony to have affected the judgment of the factfinder. Moreover, the critical nature of Cronin's testimony is underscored by the simple fact that the State's case connecting Guzman to Colvin's murder was mostly testimonial.

Furthermore, while the record is not clear about exactly when Cronin learned about the reward, the record is clear that on August 12, 1991, Cronin told law–enforcement that she did not have any information about Colvin's murder. The record is also clear that the reward was published in the newspaper on August 16, 1991 and that Cronin's story changed after notice of the reward was published.[19]   Cronin first implicated Guzman as the perpetrator of Colvin's murder on November 23-24, 1991. And it is equally clear that Detective Sylvester deposited the reward money into Cronin's inmate account on January 3, 1992, just days before Cronin testified before the grand jury.

---

[19]   Cronin was interviewed by Detective Sylvester at the Imperial Motor Lodge on August 12, 1991, and did not implicate Guzman. On August 16, 1991, the State published in two local newspapers a reward offer of $500 for information about Colvin's case. During the evidentiary hearing, Detective Sylvester testified that she could not recall if Cronin knew about the $500 reward at the time of her November 23–24, 1991 statement.

Given these indisputable facts, Guzman's defense attorney could have argued to the factfinder that Cronin was motivated to change her story and first implicated Guzman in November 1991 for the reward money. Further, Guzman's counsel could have argued that the timing of the Detective Sylvester's deposit of the reward money into Cronin's inmate account, occurring just a few days before Cronin's grand jury testimony, was an incentive for Cronin to testify favorably for the State against Guzman. Moreover, Guzman was denied a fair opportunity to impeach Cronin regarding not only the fact she was paid a reward, but the timing of the offer and payment of the reward, which could have supported an argument that Cronin's changed statement and grand jury testimony were motivated by the reward.

Third, although the Florida Supreme Court acknowledged that both Cronin and Detective Sylvester lied about the $500 reward during trial, the court either did not consider or unreasonably discounted the import of the fact that <u>both</u> Cronin and Sylvester testified falsely. <u>Cf.</u> <u>Porter v. McCullom</u>, 130 S. Ct. 447, 454 (2009) (finding the Florida Supreme Court's decision, in the context of an ineffective assistance of counsel claim, was an unreasonable application of the general <u>Strickland</u> standard, where the state court "either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction

33

hearing"). In this regard, we agree with the dissent of Justice Anstead, when he stated:

> a rational and objective factfinder would not only have considered the fact that Cronin, the most important witness for the State, was paid for her testimony, but would also have considered the fact that both this crucial witness and the lead detective in the case perjured themselves when they denied under oath that any compensation was paid to Cronin. And, critically, it would have been of especial concern to the factfinder that this crucial State witness had previously and repeatedly denied any knowledge of the case and only implicated the defendant after the State offered compensation to her.

Guzman, 941 So. 2d at 1056 (Anstead, J., dissenting). While the state court considered the failure to disclose the $500 reward as to Cronin's testimony, neither the trial court on remand, nor the Florida Supreme Court on review, addressed "the impact of the inability to impeach Detective Sylvester concerning her denial that any payment had been provided to Ms. Cronin." Guzman, 698 F. Supp. 2d at 1332. Guzman's "counsel was never given the opportunity to impeach the detective concerning her false testimony with regard to the payment, or to impeach her regarding her having permitted the key witness to give false testimony under oath before the court in the trial proceeding." Id.

The state courts' decisions were objectively unreasonable because they all but ignored the importance of Detective Sylvester's testimony and what defense counsel could have done with this impeachment evidence. In determining the

34

impact of the State's action in suppressing favorable evidence, courts should

consider how the defense's knowledge of the withheld information would have

impacted not just the evidence presented at trial, but also the strategies, tactics,

and defenses that the defense could have developed and presented to the trier of

fact.[20]  Because Detective Sylvester was the lead detective, her impeachment

would have "impugned not only her veracity but the character of the entire

investigation." Guzman, 698 F. Supp. 2d at 1332.  This would have been

consistent with Guzman's testimony that he was not involved in the offense and

evidence of other viable suspects.[21]

---

[20]  See Kyles, 514 U.S. at 442 n.13, 115 S. Ct. at 1569 n.13 ("The defense could have further underscored the possibility that Beanie was Dye's killer through cross-examination of the police on their failure to direct any investigation against Beanie.); id. at 446, 115 S. Ct. at 1571–72 ("Even if Kyles's lawyer had followed the more conservative course of leaving Beanie off the stand, though, the defense could have examined the police to good effect on their knowledge of Beanie's statements and so have attacked the reliability of the investigation in failing even to consider Beanie's possible guilt and in tolerating (if not countenancing) serious possibilities that incriminating evidence had been planted.); id. at 447, 115 S. Ct. at 1572 ("By demonstrating the detectives' knowledge of Beanie's affirmatively self-incriminating statements, the defense could have laid the foundation for a vigorous argument that the police had been guilty of negligence.").

[21]  At Guzman's trial both State and defense witnesses testified to facts which implicated persons other than Guzman in Colvin's murder.  For example, state witness James Yarborough, an employee of the Imperial Hotel, testified that he broke up an altercation between Colvin and another hotel guest named James (not Guzman) in Colvin's hotel room.  In that incident, James entered Colvin's room with an open knife and Colvin pulled his sword.  Detective Sylvester testified that she obtained information during her investigation that persons named Holt or Moore also had an altercation with Colvin in his hotel room in which a knife was involved.  Detective Sylvester also testified on August 12, 1991, the date Colvin's body was found and the police initiated their investigation, Curtis Wallace was at the Imperial Hotel.  On that date, before the police released information that Colvin's ring was missing, Wallace told the police that if a ring

35

Detective Sylvester testified about the thoroughness of the state's investigation, her contact with important witnesses in the case (including Rogers and Cronin), her search of Guzman's jail cell,[22] and her decision to focus the investigation exclusively on Guzman after Cronin implicated him in late November 1991. For example, during the first four months of investigating Colvin's homicide—from August 12, 1991 when his body was discovered until late November 1991 when Cronin first implicated Guzman—Detective Sylvester testified that law-enforcement "continued to follow-up on any information that came in." Further, during this time period, Detective Sylvester affirmed that the police had not "focused on Guzman as the sole suspect to the exclusion of everyone else." According to Detective Sylvester, she pursued "all leads" and interviewed "all possible witnesses" between early August and November 1991.

But Detective Sylvester denied that she was "able to develop any substantive evidence against anyone that would give [her] cause to arrest anyone"

---

is missing, he probably knew who committed the crime.

[22] Detective Sylvester testified that Rogers contacted her from the jail and indicated that he was Guzman's cell mate and had information to provide against Guzman. After interviewing Rogers, Sylvester obtained and executed a search warrant for Guzman's jail cell where she found amongst Guzman's belongings a corner of an envelope containing Rogers' mother's return mailing address. This evidence later became important during Rogers' testimony, in which he testified that Guzman confessed to him, to support his explanation for why he signed a sworn affidavit that Guzman never confessed to him—that Guzman knew where Rogers' mother lived and could get to his family if he testified against him.

36

before Cronin provided her statement against Guzman. This testimony from Detective Sylvester undermined Guzman's alternate suspect theory of defense. For this reason, too, Detective Sylvester's testimony and her credibility was important to the State's case. Indeed, during the evidentiary hearing in the state habeas proceeding, Guzman's trial attorney affirmed that he would have used the payment of $500 to Martha Cronin to impeach Detective Sylvester. Given these facts, the state court's failure to consider the impact of the undisclosed evidence as to Detective Sylvester was objectively unreasonable.

Our conclusion that the state court's materiality determination was objectively unreasonable is buttressed by the fact that the state's evidence connecting Guzman to the crime was circumstantial and far from overwhelming. There were no eyewitnesses or unbiased observers who testified as to the murder-robbery. Guzman never confessed to law-enforcement. Both witnesses who testified that Guzman had confessed, Cronin and Rogers, recanted their testimony at one time or another prior to trial. There was no blood or fingerprints on the sword recovered from Colvin's room. As previously noted, the medical examiner was uncertain about whether the sword or Guzman's knife were the actual murder weapons; thus, the State did not prove that either Guzman's knife or the sword was the murder weapon. As a result, Cronin's and Detective Sylvester's testimony

37

was the crux of the State's case again Guzman, and it was thus objectively unreasonable to discount the effect of bias on that crucial body of evidence under the totality of circumstances in this case.

We also find it significant that Guzman not only testified on his own behalf at trial, but also presented witnesses and otherwise challenged the State's evidence. For example, Guzman presented the testimony of Carmelo Garcia, who testified that Cronin had told him that she had lied to law enforcement regarding Guzman's involvement because she wanted to avoid being arrested for an outstanding warrant. Moreover, these facts are relevant because the materiality test for <u>Brady</u> violations, of which <u>Gilglio</u> is an aggravated species, <u>see</u> <u>Hammond</u>, 586 F.3d at 1306–07, is not a sufficiency of the evidence test. <u>See</u> <u>Kyles</u>, 514 U.S. at 425, 115 S. Ct. at 1566; <u>see also</u>, <u>Smith</u>, 572 F.3d at 1347 (stating, in the context of a <u>Brady</u> materiality analysis, "the standard that is applied is not one of sufficiency of evidence to convict)." In <u>Kyles</u>, the Supreme Court explained:

> A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a <u>Brady</u> violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

514 U.S. at 434–35, 115 S. Ct. at 12566. Thus, even assuming the state court could have diminished the significance of Cronin's testimony to oblivion (which it could not have reasonably done for the reasons described above), the fact that there may have been sufficient evidence to convict is not the relevant materiality question.

Moreover, we have carefully reviewed the entire record, examined the state court's arguments and theories in support of its decision, and afforded the state court every benefit of the doubt. Given all of these facts, we hold it was objectively unreasonable for the Florida Supreme Court to conclude that there was not any reasonable likelihood that the $500 reward and Cronin's and Detective Sylvester's perjury could not have affected the outcome in this case. We find "there is no possibility that fairminded jurists could disagree that the state court's decision" was an unreasonable application of United States Supreme Court's precedents regarding the knowing presentation of false evidence. See Harrington, ---U.S. at ---, 131 S. Ct. at 786.

Having found the state court's decision was an unreasonable application of clearly established federal law, we further find that Guzman's claim is meritorious for all the reasons discussed above. But this does not end our inquiry. We must next consider whether Guzman's Giglio claim had a substantial and injurious

effect on the outcome of his trial. See Brecht, 507 U.S. at 637–38, 113 S. Ct. at 1721–22 (directing habeas courts to determine whether constitutional errors at trial "had substantial and injurious effect or influence in determining the jury's verdict") (quoting Kotteakos v. United States, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)).  Errors are harmless where there is significant corroborating evidence, Mason v. Allen, 605 F.3d 1114, 1121–24 (11th Cir. 2010); Grossman v. McDonough, 466 F.3d 1325, 1337–40 (11th Cir. 2006), or where evidence of guilt is overwhelming.  Prevatte v. French, 547 F.3d 1300, 1305–1306 (11th Cir. 2008).

Errors are harmful, however, when there are "significant weaknesses in the State's case against the defendant."  Id. at 1306 (citation omitted).  One such weakness is where the trial boils down to a swearing match between the petitioner's and State's witnesses.  See Hill v. Turpin, 135 F.3d 1411, 1416–18 (11th Cir. 1998).  In the same vein, the petitioner is prejudiced when the State procures its key witness by violating the petitioner's rights.  See Delguidice v. Singletary, 84 F.3d 1359, 1360–64 (11th Cir. 1996) (granting the writ where the State's rebuttal witness, a psychiatrist, interviewed the defendant without adequate notice to defense counsel, and where that evidence was the State's only evidence against the petitioner's convincing insanity defense).  As we have previously demonstrated, there were significant weaknesses in the State's case against

40

Guzman and the trial boiled down essentially a credibility contest between Guzman on the one side, and Cronin and Sylvester on the other side, but the State failed to correct materially false testimony of Cronin and Sylvester. After considering the entire record in this case, we cannot say with fair assurance that the outcome of Guzman's trial was not swayed by the <u>Giglio</u> error. But even assuming, arguendo, the evidence was more evenly balanced regarding the harmlessness of the error, our "grave doubt" about the harmlessness of the error based upon the record compels us to rule in Guzman's favor. <u>See</u> <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435–37, 115 S. Ct. 992, 994–95 (1995). As a result, Guzman is entitled to a habeas relief, in this case a new trial, on his <u>Giglio</u> claim. Therefore, we affirm the District Court's Order granting Guzman a new trial on his <u>Giglio</u> claim.[23]

**AFFIRMED.**

---

[23] As noted earlier, we expressly decide Guzman's case on his <u>Giglio</u> claim without expressing any opinion regarding the reasonableness of the state court's decision with respect to his <u>Brady</u> claim.